No. 101,812

WASTE CONNECTIONS OF KANSAS, INC., a Delaware Corporation, *Appellant,* v. RITCHIE CORPORATION, a Kansas Corporation, *Appellee.*

(298 P.3d 250)

944

Opinion filed March 22, 2013.

*Steven D. Gough*, of Withers, Gough, Pike, Pfaff & Peterson, LLC, of Wichita, argued the cause, and *Donald N. Peterson, II*, of the same firm, was with him on the briefs for appellant.

*Ken M. Peterson*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Will B. Wohlford*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: This is a $550,000 price dispute arising out of plaintiff's right of first refusal to purchase a Wichita waste transfer station from defendant. The catalyst was a third-party's agreement to buy the transfer station and an adjoining landfill as a package deal or to buy the landfill alone.

The district court judge granted summary judgment to defendant Ritchie Corporation (Ritchie). A panel of our Court of Appeals reversed the summary judgment in Ritchie's favor, ruled that summary judgment should have been granted to plaintiff Waste Connections of Kansas, Inc. (Waste Connections), and ordered remand to the district court for determination of attorney fees. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 43 Kan. App. 2d 655, 228 P.3d 429 (2010). We granted Ritchie's petition for review.

Ritchie now argues that the Court of Appeals erred by discounting the role of Ritchie's business judgment when evaluating Waste Connections' breach of contract claim for violation of the implied duty of good faith and fair dealing, by holding that Waste Connections is not contractually obligated to pay $2 million for the station, and by disregarding controverted facts that should prevent judgment as a matter of law in Waste Connections' favor.

Our review of the record and analysis of the legal issues leads us to reverse the judgment of the district court, reverse the decision of the Court of Appeals, and remand the entire case to the district court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 1998, Ritchie conveyed title to a 16.8-acre

tract of land in Sedgwick County to BFI Waste Systems of North America, Inc. (BFI). On the same day, Ritchie and BFI entered into an Escrow Agreement that entitled BFI to operate the property as a nonhazardous waste transfer station. BFI was required to make quarterly payments to Ritchie based on a per-ton amount of waste material processed at the transfer station. Under the Escrow Agreement, BFI had the right to operate the transfer station for an initial period of 35 years.

The Escrow Agreement provided that an escrow agent would redeliver a deed from BFI to Ritchie conveying title to the property back to Ritchie at the end of BFI's right to use the transfer station (Ritchie's "reversionary interest"). Ritchie granted BFI a right of first refusal with respect to Ritchie's entire interest, including Ritchie's reversionary interest in the property. The Right of First Refusal, set forth in Paragraph 21(m) of the Escrow Agreement, provided:

"**Right of First Refusal.** At all times this Escrow Agreement is in effect, Buyer shall have a right of first refusal with respect to Seller's interest in this Escrow Agreement, including without limitation Seller's reversionary interest in the property, however designated, to the effect that upon receipt by Seller of *any* offer to purchase Seller's interest in this Agreement or the Property by a third party, Seller shall give written notice to Buyer of the fact and terms of such third party offer. Buyer shall have forty-five (45) days after its receipt of such notice to notify Seller in writing of its election to purchase such interest(s) on such financial terms (the 'Election Term'). In the event Buyer does not notify Seller of its election to purchase such interest(s), then Seller may sell such interest(s) on such identical terms to such third party so long as such sale is consummated within ninety (90) days after such Election Term. If such sale to the third party is not consummated within such period, then the Buyer shall again have the right of first refusal to purchase such interest(s) prior to any sale to any third party. This right of first refusal shall specifically not apply to any transfer or assignment by Seller to an affiliate of Seller or to any stockholder of Seller or any of their affiliates." (Emphasis added.)

Paragraph 21(i) of the Escrow Agreement provided:

"**Attorney[s'] Fees.** In the event of any controversy, claim or dispute between the parties arising out of this Escrow Agreement or the breach thereof, the prevailing party shall be entitled . . . to recover its costs and expenses, including without limitation, reasonable attorneys' fees, expert witness fees and investigators' fees, which shall be determined by the court if the matter is litigated or otherwise in a separate action brought for that purpose."

Paragraph 21(g) of the Escrow Agreement contained an integration clause.

On May 12, 2000, BFI assigned all of its rights, title, and interest in and to the Escrow Agreement to Waste Connections. After that date, Waste Connections operated the transfer station.

On December 17, 2001, Ritchie and Waste Connections amended the Escrow Agreement to increase the amount of the quarterly payments for which it provided. In consideration for the increased payments, Ritchie agreed not to file a petition for annexation or consent to annexation by the City of Wichita with respect to adjacent property and agreed to exert its best efforts to maintain use of the adjacent property as "Land Devoted to Agricultural Use" or a buffer zone under K.S.A. 12-519(f).

Ritchie also owned a controlling interest in C & D Recyclers of Kansas, Inc. (C & D). Hale Thompson (Tom) Ritchie II was the President and CEO of Ritchie, as well as the representative of Ritchie and C & D, who had responsibility for the transfer station and an adjoining landfill. He had the authority to make any decisions that needed to be made on behalf of Ritchie and C & D.

At some point, Cornejo & Sons (Cornejo) approached Ritchie regarding the purchase of C & D assets or stock. After discussions, on June 22, 2007, Ritchie and C & D entered into an Asset Purchase Agreement with Cornejo. Pursuant to the Asset Purchase Agreement, Ritchie and C & D agreed to sell the landfill, certain option rights to purchase additional property adjacent to the landfill, and all of Ritchie's rights and obligations under the Escrow Agreement.

The Asset Purchase Agreement specified the following:

"2.1.   Purchase Price Payment. The purchase price for the entirety of the Assets shall be Four Million Nine Hundred Fifty Thousand Dollars ($4,950,000) . . . , of which Two Million Dollars ($2,000,000) will be allocated and paid to Ritchie Corporation for the purchase of its rights and the assumption of its obligations under the Escrow Agreement.

"In the event that Waste Connections of Kansas, Inc.[,] shall, upon receipt of due and proper notice from Sellers, elect to exercise its right of first refusal under the Escrow Agreement, the parties agree that the purchase price for the remaining assets shall be Three Million Five Hundred Thousand Dollars ($3,500,000.00)."

The Asset Purchase Agreement also included an integration clause in its Section 12.3.

On June 27, 2007, Terry Pilgreen, counsel for Ritchie, sent a letter to Waste Connections. The letter stated in part:

"Ritchie Corporation has received an offer to acquire its interest in the Escrow Agreement for $2,000,000.00 cash as specified in the attached Asset Purchase Agreement. Waste Connections of Kansas, Inc.[,] holds a Right of First Refusal pursuant to Section 21(m) of the Escrow Agreement, and on behalf of my client, Ritchie Corporation, this correspondence shall serve as notice of the facts and terms of the referenced third-party offer. Should Waste Connections of Kansas, Inc.[,] not exercise its Right of First Refusal within forty-five (45) days after receipt of this notice, you are hereby advised that Ritchie Corporation will sell its interest in the Escrow Agreement for $2,000,000.00 cash as specified in the Asset Purchase Agreement."

Robert Epstein, counsel for Waste Connections, testified in a deposition that he called Pilgreen on August 2, 2007, and advised him that Waste Connections believed it should have to pay Ritchie only $1.45 million for the transfer station, not $2 million. He then sent a letter to Pilgreen on August 3, 2007. In the letter, Epstein stated in relevant part:

"The purpose of this letter is to advise you that Waste Connections of Kansas, Inc.[,] has elected to exercise its option to purchase Ritchie Corporation's interest in the Wichita Transfer station property pursuant to the provisions of the Escrow Agreement.

"Please advise your client that Waste Connections of Kansas has exercised its option to purchase. There are certain matters with respect to the contract which I believe we need to discuss in greater detail. Please contact me upon your receipt of this letter so that we may proceed to complete this purchase and sale. We would like to schedule a conference call to discuss certain matters relating to this transaction."

Pilgreen forwarded Epstein's letter to Chuck Hill, Director of Regulatory Affairs at Cornejo, on August 6, 2007, and talked to Hill by telephone the same day about Waste Connections' position on the appropriate price for the transfer station. Hill's email response, dated the same day, stated:

"Terry: I have discussed this matter with Ron [Cornejo] and Dave Royce. Our position is as follows:

"We have a contract by which we agreed to purchase the Ritchie transfer station interest and the C & D Landfill for a combination price of $4,950,000, of which it was agreed $2 million would be allocated to and paid to Ritchie for the transfer station interest.

"Alternatively, if [Waste Connections] exercises its right of first refusal to purchase the Ritchie transfer station interest, we have agreed to pay 3.5 million for the landfill as a stand-alone purchase.

"It seems to us that any dispute as to the effect of the Cornejo/Ritchie purchase agreement on the Ritchie/[Waste Connections] escrow agreement is a matter to be resolved between Ritchie and [Waste Connections], and that we really have no particular rights to enforce as to [Waste Connections] at this time.

"As you will recall, we really had no initial desire to purchase anything other than the landfill, but Ritchie determined that because of the requirement for the agricultural buffer around the landfill, that you could not practically separate the two.

"I guess our bottom line position is that if Ritchie determines that the combined reading of the Cornejo/Ritchie purchase agreement with the Ritchie/[Waste Connections] escrow agreements is that [Waste Connections] must be allowed to purchase the transfer station interest for $1,450,000, that is okay with us, as long as we get the landfill for 3.5 million."

Epstein also testified in his deposition that he asked Pilgreen during an August 9, 2007, conference call whether Cornejo would be willing to allow Waste Connections to purchase the transfer station for $1.45 million while it paid $3.5 million for the landfill. Pilgreen did not respond.

On August 10, 2007, Epstein sent another letter to Pilgreen, which stated in part:

"The purpose of this letter is to advise you, again, that Waste Connections of Kansas, Inc.[,] has elected to exercise its right of first refusal pursuant to Paragraph 21(m) of the Escrow Agreement to purchase Ritchie Corporation's interest in the Wichita Transfer Station Property.

"I understand that you have already advised your client that Waste Connection of Kansas has elected to exercise its right of first refusal under the Escrow Agreement. Please provide me with your written confirmation of your client's timely receipt of my client's election. As we have made you aware, there are certain matters with respect to the contract which require ongoing discussion. We look forward to proceeding to complete this purchase and sale."

On August 15, 2007, Pilgreen sent a letter in response to Epstein:

"I am in receipt of your two pieces of correspondence dated August 3 and August 10, 2007, respectively, concerning the above referenced matter. I acknowledge that both pieces of correspondence were received within forty-five (45) days of your receipt of my June 27, 2007[,] notice to you and your client."

On August 16, 2007, Pilgreen and Epstein spoke by telephone. Epstein then again wrote to Pilgreen:

"Thank you for your letter of August 15, 2007[,] acknowledging that you have received my two previous letters. In our telephone conversation today you indicated that you are unclear as to whether my client had properly exercised its right of first refusal pursuant to the provisions of the Escrow Agreement. To make things abundantly clear, yet again, please be advised that my client is exercising its right of first refusal to purchase Ritchie Corporation's interest in the transfer station property pursuant to Paragraph 21(m) of the Escrow Agreement and pursuant to the terms set forth in Ritchie Corporation's Agreement with Cornejo to sell the transfer station and the C & D Landfill. Please understand further that my client exercises its right of first refusal and reserves all of its rights and remedies at law or in equity."

On September 13, 2007, Steven Gough, local counsel working with Epstein, sent a letter to Pilgreen. The letter stated in part: "This letter will serve to reaffirm that Waste Connections has elected to exercise its right of first refusal to purchase all of Ritchie's interest in the Escrow Agreement, including Ritchie's reversionary interest, pursuant to the provisions of the Escrow Agreement as applied to the Asset Purchase Agreement." The letter also explained Waste Connection's position as to the price of the transfer station. Referencing the second paragraph of Section 2.1 of the Asset Purchase Agreement, Gough wrote:

"The above-referenced provision establishes, in our view, the true intent of the parties under the Asset Purchase Agreement, namely, that the Seller agreed to sell the Wichita Transfer Station and the Landfill with option rights for a total of $4.95 million with $3.5 million allocated to the Landfill and $1.45 million allocated to the Wichita Transfer Station. We believe that a Court will review the above provision as a mechanism to inflate the price of the Wichita Transfer Station by $550,000.00 (to $2,000,000.00) in violation of Paragraph 21(m) of the Escrow Agreement[,] which defines the Right of First Refusal for Waste Connections to purchase under the 'fact and terms of such third party offer.' "

Gough's letter continued: "There is a bona fide dispute between Ritchie Corporation and Waste Connections concerning the price

that must be paid under the Right of First Refusal." Gough advised that Waste Connections had "delivered to the Escrow Agent a certified check payable to Ritchie in the amount of $2 million . . . subject to its express reservation of its rights to determine the proper price payable for its exercise of the Right of First Refusal" and that Waste Connections had filed a petition for declaratory judgment. Gough also advised that Waste Connections had "enclosed a revised agreement for this transaction, the 'Right of First Refusal Exercise and Release of Escrow,'" and, "[w]hether the purchase price for the Wichita Transfer Station is ultimately determined to be $2 million or $1.45 million, Waste Connections has exercised its Right of First Refusal and is entitled to close this transaction without delay."

Waste Connections' petition sought determination of "whether the proper price owed under Paragraph 21(m) of the Escrow Agreement, as applied to the Asset Purchase Agreement, was $1.45 million rather than $2 million," claiming that the pricing provision of the Asset Purchase Agreement was "a mechanism used by Ritchie to improperly inflate the price to be paid by Waste Connections for the Wichita Transfer Station." As a result, Waste Connections asserted, Ritchie owed it $550,000 plus interest, attorney fees and expenses. Waste Connections also asserted entitlement to specific performance of the Escrow Agreement and an injunction to prevent Ritchie's transfer of its interest to any third party, including Cornejo.

Ritchie filed its answer and counterclaim. Its counterclaim sought declaratory judgment in its favor that (a) the Asset Purchase Agreement constituted a "bona fide third-party offer to purchase" its rights under the Escrow Agreement for $2 million; (b) Ritchie properly informed Waste Connections of the offer; and (c) Waste Connections accepted Ritchie's offer to sell and exercised its Right of First Refusal to purchase the transfer station at a price of $2 million. Ritchie also sought attorney fees, costs, and expenses.

The day after Ritchie filed its answer and counterclaim, on September 28, 2007, Waste Connections and Ritchie executed a Right of First Refusal Exercise and Release of Escrow. Its Paragraph 1 provided:

"By timely written notice Waste [Connections] elected to exercise its Right of First Refusal pursuant to Paragraph 21(m) of the Escrow Agreement to acquire Ritchie's interest in the Escrow Agreement and Ritchie's reversionary interest in the property subject to the Escrow Agreement. On September 13, 2007, Waste [Connections] delivered a certified check to the Escrow Agent in the amount of $2,000,000.00, payable to Ritchie, with a reservation of Waste [Connections'] right to seek a determination that Waste [Connections] is actually required to pay only $1,450,000.00 under Paragraph 21(m) of the Escrow Agreement when applied to the Purchase Agreement to exercise its Right of First Refusal, which reservation includes all remedies available in the event such a determination is made. The parties acknowledge that Waste [Connections] has filed a Verified Petition for Declaratory Judgment in a case styled *Waste Connections of Kansas, Inc. v. Ritchie Corporation, Cornejo & Sons, Inc., and O'Rourke Title Company*, Case No. _____, District Court, Sedgwick County, Kansas ('Lawsuit') to determine the proper price owed under Waste [Connections'] Right of First Refusal and for other remedies."

On the same date, Waste Connections and Ritchie also executed a Reservation of Rights. In it, Ritchie and Waste Connections acknowledged and agreed:

"[T]he following rights are expressly reserved and shall survive the closing of the sale of the land identified in the pending action referenced below: Ritchie Corporation expressly reserves all rights it has to pursue Waste Connections of Kansas, Inc., as provided in Paragraph 21(i) of the Escrow Agreement dated December 29, 1998, for attorney's fees, expenses and costs in connection with fees, expenses and costs incurred in the lawsuit known as *Waste Connections of Kansas, Inc., v. Ritchie Corporation, et al.*, Sedgwick County, District County Case No. 07 CV 3308 in which Ritchie Corporation has been named as a party by Waste Connections of Kansas, Inc. Waste Connections of Kansas, Inc., also reserves all of its rights against Ritchie Corporation as provided in Paragraph 21(i) of said Escrow Agreement, including remedies asserted in the pending lawsuit, which reservation shall survive the closing date of the sale of the land identified in the pending lawsuit referenced above."

Also on the same date, counsel for Ritchie formally acknowledged that Ritchie had received $2 million from Waste Connections on September 12, 2007. The events of September 28, 2007, rendered Waste Connections' original prayer for specific performance and injunction moot. All that remained for resolution was identification of the correct transfer station price.

Waste Connections filed its answer to Ritchie's counterclaim, requesting that "Ritchie be denied any relief whatsoever on its

purported Counterclaim, be required to refund $550,000.00 to Waste Connections[,] . . . and be required to bear the full cost of this action."

Discovery depositions eventually revealed additional relevant information.

Douglas Sommers, an employee of Ritchie and later General Manager of C & D, worked for C & D until December 2007. He testified that Ritchie believed it could insert a provision into a sale contract for the landfill that would require the buyer to maintain the buffer zone, but it then might be forced to institute a court action against a third party to enforce the obligation if it was not honored by the buyer. Because this was undesirable, Sommers advised Tom Ritchie that Ritchie could require both assets to be sold together, relieving itself of the obligation to maintain the buffer zone.

David Buchholz, Ritchie's Chief Financial Officer, testified that he provided Tom Ritchie with a discounted cash flow analysis for valuation of the transfer station. The goal was to predict a stream of royalties attributable to the Escrow Agreement as amended, and to discount those royalties to present value. Buchholz testified that he told Tom Ritchie that the transfer station was worth well in excess of $2 million. Buchholz also testified that Ritchie's counsel "was of the opinion that it would be better, for purposes of assuring that we handled the right of first refusal properly[,] . . . if there were two separate contracts with Cornejo," and that he agreed with counsel. But it was his understanding that Cornejo would not have allowed the deal to be structured in such a manner.

Tom Ritchie insisted that any sale to Cornejo had to include both the landfill and the transfer station. He testified that the assets were to be sold "all or none" because the interest in the transfer station carried obligations related to operation of the landfill. He also testified that Cornejo told Ritchie it had no opinion how the $4.95 million was allocated in a package sale, as long as it could buy the landfill for $3.5 million. Tom Ritchie explained that it was Ritchie's idea to allocate $2 million of the purchase price to the transfer station. He further testified: "I thought the transfer station was worth at least $2 million, and I have a duty to my company to

attempt to get the best deal I can for the shareholders of th[e] company." Although Ritchie would have been willing to accept $1.45 million for the transfer station and $3.5 million for the landfill as a package deal, "what [Ritchie] actually agreed is fully contained in its entirety within the Asset Purchase Agreement."

Ronald Cornejo, the Chief Executive Officer of Cornejo, mentioned in Hill's email, testified that he had the authority to make the deal with Ritchie. Ritchie initially attempted to get $5,500,000 from Cornejo for a purchase of the landfill and transfer station as a package deal. Cornejo was unwilling to pay that amount for both assets and would pay a total of only $4.95 million. Ronald Cornejo further testified that he did not suggest the $2 million allocation of the purchase price for the transfer station; Ritchie suggested it during negotiations. At no time, Ronald Cornejo said, did his company believe that the transfer station was worth $2 million to it. Initially it believed that the transfer station was worth only $850,000. To reach this number, Ronald Cornejo testified, his company compared risk to revenue generated. The risk involved with the transfer station arose out of Waste Connections' right under the Escrow Agreement to terminate and shut down the royalty stream with 90 days' notice. Ronald Cornejo testified that his opinion on the worth of the transfer station changed as he acquired additional information. But $3.5 million was Cornejo's "highest and best offer" for the landfill, and Cornejo "didn't care" if it ended up with the transfer station as well. It had no objection to the sale of the transfer station to Waste Connections for $1.45 million, and it was willing to pay that amount for the transfer station.

Charles David Royce, the Chief Financial Officer of Cornejo, also mentioned in Hill's email, testified that Cornejo was unwilling to pay $2 million for the transfer station. He confirmed that Ritchie sought $5,500,000 for the transfer station and landfill together, but Cornejo would not pay that price. Cornejo "want[ed] the landfill, period" and would pay $3.5 million. Cornejo did not believe that the transfer station was worth $2 million but agreed to pay $1.45 million. Cornejo "didn't care" how the package total of $4.95 million was allocated between the landfill and the transfer station.

Sommers was present during two conference calls among Buchholz, Pilgreen, and Epstein. During those calls, he said, Epstein stated that Waste Connections wanted to exercise its right of first refusal, but at a price other than $2 million. Waste Connections asserted that it should pay only $1.45 million. Pilgreen told Epstein that Pilgreen was unsure whether Waste Connections had exercised its right of first refusal effectively because of the parties' dispute over price.

James Little, Vice President of Waste Connections, testified that Waste Connections relied upon Ritchie's acknowledgements in the Right of First Refusal Exercise and Release of Escrow, as well as the Reservation of Rights, when it agreed to release $2 million to Ritchie rather than deposit the disputed amount into court.

On June 18, 2008, Waste Connections filed a motion to amend its petition. The motion argued that the original petition had stated a claim for breach of the duty of good faith and fair dealing by Ritchie, and it listed further evidence from depositions to demonstrate support for that claim. According to Waste Connections, the amended petition merely clarified "that Ritchie's bad faith and unfair dealing was involved in the manipulation of the Right of First Refusal price to be paid." The amended petition again sought declaratory relief. It also set forth a second count for breach of the Escrow Agreement, incorporating the allegations made in support of the declaratory judgment count and further stating that "Ritchie has acted in bad faith and dealt unfairly with Waste Connections." The district court granted Waste Connection's motion to amend.

Ritchie filed its answer to Waste Connections' amended petition and renewed its original counterclaim.

In the Pretrial Conference Order filed September 3, 2008, Waste Connections' contentions included (1) that Ritchie breached the Escrow Agreement by violating its duty to act in good faith and to deal fairly by manipulating the price allocated to the transfer station; (2) that Ritchie acted in bad faith and dealt unfairly with Waste Connections by failing to require Cornejo, which had purchased the landfill, to maintain the buffer zone around it, "destroying the contractual benefit that [Waste Connections] bargained for . . . in the Amendment to Escrow Agreement"; and (3) that Ritchie

failed to inform Waste Connections that Cornejo was willing to pay and Ritchie was willing to accept $1.45 million for the transfer station in Pilgreen's June 27, 2007, letter—facts that "should have been disclosed and would have been disclosed but for [Ritchie's] desire to act in bad faith and to deal unfairly" with Waste Connections—an independent breach of the right of first refusal in the Escrow Agreement. Ritchie's contentions denied that it acted in bad faith; asserted that Waste Connections waived or was estopped from asserting its right to the $550,000 difference between $2 million and $1.45 million by its August 3 and 10, 2007, letters; and reiterated its request for declaratory judgment. Ritchie also specifically denied that it had any obligation under the amendment to the Escrow Agreement to require Cornejo to maintain a buffer zone.

Shortly after the filing of the Pretrial Conference Order, the parties filed cross-motions for summary judgment in the district court.

Waste Connections argued in its motion that it was entitled to judgment as a matter of law because the uncontroverted evidence showed that "Cornejo was at all times willing to agree to an allocation for the purchase of both assets and that Ritchie was willing to accept payment from Cornejo for both assets under the following price allocation: Transfer Station for $1.45 million and the landfill for $3.5 million for a total of $4.95 million." In its memorandum in support of its motion, Waste Connections argued that "although Ritchie tried to establish an artificial value of $2 million for the transfer station, $1.45 million was the true value placed upon the transfer station by Cornejo and was a price Ritchie was willing to accept for the asset, thereby establishing the purchase price of the transfer station for Waste Connections." Waste Connections argued that Ritchie breached its obligations under the right of first refusal by breaching the duty of good faith and fair dealing and by failing to disclose to Waste Connections the existence and terms of the contemplated sale to Cornejo.

Waste Connections further argued that Ritchie could not defeat summary judgment by arguing waiver, estoppel, or offer and acceptance. Waste Connections argued that "Ritchie's defense of of-

fer and acceptance fails because Waste Connections acted consistent with its rights in accepting the bona fide offer price of $1.45 million." According to Waste Connections, Ritchie was barred from raising equitable defenses because it had unclean hands and failed to show that the elements of waiver or estoppel had been met.

Ritchie's response to Waste Connection's motion argued that "[a]fter accepting an explicit offer made by Ritchie on unambiguous and particular terms pursuant to a right of first refusal, Waste Connections is now attempting to improperly restructure the deal." Ritchie took the position that none of the evidence Waste Connections had gathered "demonstrate[d] collusion or manipulation of the price terms" but was "merely evidence of negotiation and discussions over pricing and terms . . . between Cornejo and Ritchie."

In its own summary judgment motion, Ritchie argued that "undisputed facts establish[ed] that Waste Connections accepted an explicit written offer from Ritchie pursuant to a right of first refusal." According to Ritchie, Waste Connections was "improperly attempting to have [the district court] restructure a binding contract" and Waste Connections "failed to demonstrate a genuine issue of material fact regarding its claim that Ritchie breached the implied duty of good faith and fair dealing." In its memorandum in support of its motion, Ritchie argued that the case turned on a "pure question of contract law," the consequences of accepting an unambiguous offer. Ritchie argued that Waste Connections' right of first refusal "was triggered only upon the happening of two preconditions: the receipt by Ritchie of a bona fide offer to purchase the transfer station and the decision by Ritchie to sell the transfer station property to the third party," two preconditions that did not occur until "the execution of the Asset Purchase Agreement [by Ritchie and Cornejo,] which contained the offer from Cornejo to purchase the transfer station for $2 million." Pursuant to its right of first refusal, Waste Connections "was entitled to purchase Ritchie's interest in the transfer station on the same financial terms offered by Cornejo[—$2 million, as] set forth clearly and unambiguously in the Asset Purchase Agreement."

Ritchie further argued that the doctrines of equitable estoppel and waiver precluded relief for Waste Connections because "Waste Connections accepted the offer, and it cannot now be permitted to pursue divergent positions regarding the agreement with Ritchie." In Ritchie's view, "Waste Connections could have pursued injunctive relief to prevent the sale of the transfer station interest until the price was determined," but it chose to go through with the sale and tender payment instead.

Ritchie also argued that Waste Connections failed to come forward with evidence to support its claim that Ritchie breached its duty of good faith and fair dealing. Ritchie maintained that it had "no independent contractual obligation" to disclose precontract negotiations to Waste Connections, that there was "no evidence that Ritchie prevented Waste Connections from exercising its right of first refusal," and that there was "no evidence that Ritchie's actions injured or destroyed Waste Connections' rights under the Escrow Agreement" because Ritchie "fully conveyed the facts and terms of the bona fide third-party offer from Cornejo." Ritchie further argued that it "was entitled under the law to act in a manner that is in the best interest of Ritchie's business," and, therefore, "must be free to obtain the highest offer for its asset."

Waste Connections responded to Ritchie's motion for summary judgment by arguing that Ritchie "completely ignore[d] its duty of good faith and fair dealing" and that "[i]n breach of this duty, Ritchie manipulated the price allocated to the Transfer Station in its negotiations with Cornejo." Waste Connections acknowledged that "a right of first refusal is framed by a bona fide offer and an intent to sell," but it argued that "Ritchie improperly ignore[d] the caveat that the offer and intent to sell must not be subject to collusion or bad faith manipulation." Waste Connections also argued that the Asset Purchase Agreement, read in light of the "well recognized rule of contract interpretation requiring provisions within a writing to be reconciled when possible," constituted an ambiguous writing.

The district judge denied Waste Connections' motion for summary judgment and entered judgment in favor of Ritchie, holding that Ritchie was entitled to the declaratory judgment it sought as

well as judgment in its favor on Waste Connections' claim for breach of contract for violation of the implied duty of good faith and fair dealing. The district judge also ruled that, "pursuant to Section 21(i) of the Escrow Agreement, Ritchie, as the prevailing party, is entitled to recover its costs, expenses and reasonable attorneys fees related to the current action," totaling $108,972.15.

In reaching his decision, the district judge said that paragraph 21(m) of the Escrow Agreement entitled Waste Connections to "step into the shoes of a third-party purchaser and purchase Ritchie's interest in the Transfer Station for the same price offered or agreed by a bona fide third-party purchaser." He continued:

"2. The Court notes specifically that from the beginning Ritchie required Cornejo to buy the landfill as a package and wanted to allocate $3.5 million to the landfill and $2 million for the transfer station. As the Court looked through the facts, it finds nothing to suggest that Ritchie in any way tried to manipulate with Cornejo the price Ritchie was seeking for the transfer station, nor did Ritchie [waver] in dealing with Cornejo in making a contract with Cornejo that deviated from that desire to obtain $2 million for the transfer station. The Court finds that Ritchie as seller has the right to establish the value for its property absent some kind of bad faith or collusion and the Court finds no evidence that suggests there was bad faith or collusion on the part of Ritchie in arriving at a contract, which it did in this case, which established a $2 million value for the transfer station. The acceptance of that offer by Cornejo established a $2 million dollar value for the transfer station property. The acceptance of that offer by Cornejo established the contract and triggered the right of first refusal in the escrow agreement which the plaintiff has now exercised. The plaintiff now wishes the Court, in the Court's opinion, to reform the original contract to something more acceptable to the plaintiff.

"3. Package sale transactions which include a parcel of property burdened by a right of first refusal with another piece of property that is not so burdened must be examined very carefully in order to protect the holder of the right of first refusal from a collusive effort or bad faith dealing on the part of one to arbitrarily or capriciously set a price too high to extort or get from a person a value that they would not otherwise have to pay if there was a willing buyer and a willing seller. The willing seller must have the right to say 'I'm not selling this piece of property other than for this price.' Clearly the evidence establishes that $2 million was the price they set out to get and there is no evidence that the Court can find that would suggest there was bad faith or unfair dealing in this case to establish that price. Pursuant to the Asset Purchase Agreement, Cornejo agreed to pay $2 million for Ritchie's interest in the Transfer Station. Waste Connections was entitled

to step into the shoes of Cornejo and purchase the Transfer Station from Ritchie for $2 million."

Waste Connections appealed, and a panel of our Court of Appeals reversed the summary judgment for Ritchie, granted judgment to Waste Connections, and ordered remand to the district court for reconsideration of attorney fees. The essence of the panel's merits holding was that a presumption arose in favor of Waste Connections as the holder of the right of first refusal on a component in a package deal, and any upward fluctuation in price on that component that was dependent upon exercise of Waste Connections' right meant that Ritchie did not act in good faith as a matter of law. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 43 Kan. App. 2d 655, 667-70, 228 P.3d 429 (2010).

In its opinion, the panel first agreed with Waste Connections that it had preserved its opportunity to challenge the purchase price, *i.e.*, that it had executed the right of first refusal under protest on the terms. *Waste Connections of Kansas, Inc.*, 43 Kan. App. 2d at 663, 665. The panel also concluded that the Asset Purchase Agreement's price for the transfer station was ambiguous, because the price fluctuated based on whether Waste Connections exercised its right of first refusal. *Waste Connections of Kansas, Inc.*, 43 Kan. App. 2d at 666-67.

In order to determine the actual sale price for the transfer station, the Court of Appeals examined Waste Connections' allegation of bad faith. The Court of Appeals reviewed the evidence and found that "[t]he only thing Cornejo agreed to was a package purchase price of $4.95 million." *Waste Connections of Kansas, Inc.*, 43 Kan. App. 2d at 668. Holding that "any doubt in the amount [of the purchase price] should be resolved to protect the right of first refusal," the Court of Appeals concluded that Ritchie had acted in bad faith by attempting to maximize its profits at Waste Connections' expense, and that Waste Connections was entitled to summary judgment in the amount of $550,000. *Waste Connections of Kansas, Inc.*, 43 Kan. App. 2d at 667-68, 670.

Although the panel reasoned that right of first refusal holders face special risks in package deals and need special protection, the

panel cited no authority for the presumption upon which its analysis relied.

## DISCUSSION

Ritchie's petition for review places all of the parties' contentions recited in the Pretrial Conference Order, with the exception of their dispute over the buffer zone, in play. We ultimately decide that neither party is entitled to summary declaratory judgment in its favor; that the case must be remanded to the district court for trial on the merits of Waste Connections' breach of contract claim, including its allegation of Ritchie's bad faith, because genuine issues of material fact persist; that an award of costs, expenses, and attorney fees incurred in the district court litigation is premature; and that neither party is entitled to attorney fees incurred on this appeal at this time.

*Standards of Review*

The standard governing cases that arise on appeal from summary judgment is often recited:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Gaumer v. Rossville Truck & Tractor Co.*, 292 Kan. 749, 751-52, 257 P.3d 292 (2011).

In this case, both parties sought summary declaratory judgment in the district court, seeking a court statement of their "rights, status, and other legal relations" under two written contracts, the Escrow Agreement between them and the Asset Purchase Agreement between Ritchie and Cornejo. See K.S.A. 60-1701 (purpose of declaratory judgment action); K.S.A. 60-1704 (person having interest under written contract may seek declaratory judgment on

"any question of construction" arising under contract, "declaration of rights, status or other legal relations thereunder"); K.S.A. 60-1705 (court in declaratory judgment action may construe contract "in the event of an actual or threatened breach thereof"). Kansas statutes authorizing declaratory judgment actions are remedial and meant to be liberally construed "to settle and provide relief from uncertainty and insecurity" with respect to disputed "rights, status and other legal relations." K.S.A. 60-1713. Nevertheless, a court may decline to render or enter a declaratory judgment if it will not "terminate the uncertainty or controversy giving rise to the proceeding." K.S.A. 60-1708.

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011) (citing, *e.g.*, *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 [2007]). If, on the other hand, the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it. See *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24 (1992); *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 838-40, 508 P.2d 889 (1973). In addition,

" '[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]' *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000)." *Levin v. Maw Oil & Gas*, 290 Kan. 928, 939, 234 P.3d 805 (2010).

In general, parties may contract to any terms so long as they are neither illegal nor contrary to public policy. See *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 670-71, 876 P.2d 1362 (1994); *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 757, 549 P. 2d 903 (1976); *Hill v. Perrone*, 30 Kan. App. 2d 432, 435, 42 P.3d 210 (2002).

A written contract is amenable to interpretation as a matter of law by the court. See, *e.g.*, *McGinley v. Bank of America N.A.*, 279

Kan. 426, 431, 109 P.3d 1146 (2005). But, if the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary declaratory judgment is inappropriate. See *Mobile Acres*, 211 Kan. at 838-40 (written lease ambiguous; extrinsic evidence conflicting; summary declaratory judgment reversed); contra *Wulf v. Schulz*, 211 Kan. 724, 731, 508 P.2d 896 (1973) (when no genuine issue of fact remains, lease unambiguous; lease can be construed upon motion for summary judgment in declaratory judgment action) (citing *Mays v. Middle Iowa Realty Corp.*, 202 Kan. 712, 719, 452 P.2d 279 [1969]).

The question of whether the language in a written contract is ambiguous is one of law for the court. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 264, 225 P.3d 707 (2010); *Mobile Acres*, 211 Kan. at 839. And the parties' agreement or lack of agreement on the existence of ambiguity does not compel the court to arrive at the same conclusion. See *Mobile Acres*, 211 Kan. at 836-37, 839 ("On appeal, both sides vigorously assert that contract is not ambiguous. However, they disagree violently as to what is meant by or included within the [contract language]. This difference of opinion might tend to indicate that each side considers the lease agreement as being unambiguous only in its own favor. . . . While we respect the views and opinions of eminent counsel, we are not bound by agreement on their part that the [subject contract] is unambiguous.").

Whether a contract has been formed by an exchange of writings is a question of law. See *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 283, 286 P.3d 542 (2012); *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007). Whether a contract has been breached is a question of fact. *Bank of America v. Narula*, 46 Kan. App. 2d 142, 168, 261 P.3d 898 (2011); *Wichita Clinic v. Louis*, 39 Kan. App. 2d 848, 868, 185 P.3d 946 (citing *Dutta v. St. Francis Regional Med. Center, Inc.*, 18 Kan. App. 2d 245, 257, 850 P.2d 928 [1993], *aff'd* 254 Kan. 690, 867 P.2d 1057 [1994]), *rev. denied* 287 Kan. 769 (2008); see also 17 B C.J.S. Contracts § 1034, p. 482 (question of whether facts established by party constitutes breach of contract one of law, but whether facts sufficient to constitute breach of

contract have been established ordinarily question of fact; thus, when facts in dispute, when reasonable persons could differ on inferences to be drawn from facts, question must be determined by trier of fact; summary judgment improper).

In this case, one of Ritchie's alleged breaches of the Escrow Agreement is the violation of the duty of good faith and fair dealing inherent in all Kansas contracts, except employment-at-will contracts. See *Estate of Draper v. Bank of America*, 288 Kan. 510, 525, 205 P.3d 698 (2009); see also *Nungesser*, 283 Kan. at 560 (action alleging breach of duty of good faith sounds in contract) (citing *Glenn v. Fleming*, 247 Kan. 296, 311-13, 799 P.2d 79 [1990]; *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 920, 611 P.2d 149 [1980]). Whether the duty of good faith and fair dealing has been violated raises a question of fact. See *Hill*, 30 Kan. App. 2d at 437 (motivation of party who failed to perform raises question for jury); *St. Catherine Hospital of Garden City v. Rodriguez*, 25 Kan. App. 2d 763, 765, 971 P.2d 754 (1998) (whether contract's good-faith standard met raises question for jury).

We have previously described the requirements of the duty of good faith and fair dealing in this way:

" 'Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties. . . . [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.' (Citations omitted)." *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987).

*Waste Connections' Continuing Ability to Challenge Transfer Station Price*

The threshold question we must answer is the second posed by Ritchie on its petition for review: Did Waste Connections successfully preserve its ability to challenge the purchase price paid for the transfer station?

Ritchie has repeatedly argued that Waste Connections waived or is estopped from pursing its claim that it should have to pay only $1.45 million for the transfer station because Epstein's August 3 and 10, 2007, letters accepted Ritchie's offer to sell the transfer station for $2 million. In Ritchie's view, a binding contract was formed no later than the time of the second letter, and the Right of First Refusal Exercise and Release of Escrow and the Reservation of Rights executed by it and Waste Connections on September 28, 2007, "more than a month after Waste Connections' acceptance . . . at most . . . only allow[ed] Waste Connections to preserve its right to file suit through closing and prevent[ed] bar under the doctrine of merger."

Waste Connections has consistently argued in response that it always disputed Ritchie's attempted $2 million allocation to the transfer station in the Asset Purchase Agreement and that it properly and promptly reserved the right to seek a determination of the correct price and a refund of any overpayment.

On examination of the Pilgreen letter and enclosure of June 27, 2007, and of the Epstein letters of August 3 and 10, 2007, we conclude that no binding $2 million contract for sale of the transfer station was formed. As between these parties, the primary function of the Asset Purchase Agreement sent with Pilgreen's letter was to fill in the essential price term omitted from the right of first refusal in the Escrow Agreement. But, as further discussed below, the Asset Purchase Agreement was ambiguous on this point. Reasonable people could—and have—read it to set a transfer station price of either $2 million or $1.45 million. The return letters from Epstein did not resolve this ambiguity. They were silent on price, with the exception of what Waste Connections has now described as its intended inclusion of price in the letters' vague allusions to matters yet to be discussed. The resulting indefiniteness on *the* essential term of any agreement is fatal to contract formation. See *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 488, 15 P.3d 338 (2000); *Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 60, 643 P.2d 100 (1982); *Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, 414, 479 P.2d 875 (1971).We cannot supply the essential price

term, because we have no evidence before us to establish a meeting of the minds on that integral point. See *Dougan*, 270 Kan. at 488.

Moreover, in the Right of First Refusal and Release of Escrow, signed by both Waste Connections and Ritchie on September 28, 2007, the parties explicitly agreed that Waste Connections had timely exercised its right of first refusal and paid $2 million to the Escrow Agent for Ritchie, subject to its reservation of its right to dispute price:

"On September 13, 2007, Waste [Connections] delivered a certified check to the Escrow Agent in the amount of $2,000,000.00, payable to Ritchie, *with a reservation of Waste [Connections'] right to seek a determination that Waste [Connections] is actually required to pay only $1,450,000.00 under Paragraph 21(m) of the Escrow Agreement when applied to the Purchase Agreement to exercise its Right of First Refusal, which reservation includes all remedies available in the event such a determination is made.* The parties acknowledge that Waste [Connections] has filed a Verified Petition for Declaratory Judgment." (Emphasis added.)

The Reservation of Rights, also executed by the parties on September 28, 2007, also made their mutual understanding of the continuing existence of a price dispute abundantly clear:

"The parties to this 'Reservation' hereby *expressly agree* that the following rights are expressly reserved and shall survive the closing of the sale of the land identified in the pending action referenced below . . . . Waste [Connections] . . . *reserves all of its rights against Ritchie Corporation as provided in Paragraph 21(i) of said Escrow Agreement, including remedies asserted in the pending lawsuit,* which reservation *shall survive the closing date of the sale of the land* identified in the pending lawsuit referenced above." (Emphasis added.)

If Ritchie's execution of the Right of First Refusal Exercise and Release of Escrow and of the Reservation of Rights means anything, it is that the waiver and estoppel arguments it advances are completely without merit. Ritchie fully and clearly acknowledged in writing the existence and postsale survival of a dispute between it and Waste Connections over the price Waste Connections was required to pay upon exercise of its right of first refusal. Waste Connections' payment of the $2 million was made under the protest the September 28, 2007, documents plainly conveyed. See *Juneau v. Stunkle*, 40 Kan. 756, 757, 20 Pac. 473 (1889) ("[T]he defendant showed that at the time of making the payments there

was some controversy about the amount due, and it was agreed between himself and the plaintiff that, if it was finally discovered that the amount claimed by the plaintiff exceeded the amount of the plaintiff's claim at final settlement, plaintiff was to repay the defendant such excess."). Ritchie cannot now treat its express written agreements in these documents as though they never had any force or effect, claiming that the question they explicitly left open had already been irrevocably settled as a matter of law more than a month earlier.

*The Propriety of Judgment as a Matter of Law on Price*

The terms of the right of first refusal at issue here, specified in Paragraph 21(m) of the Escrow Agreement, gave Waste Connections the right to exercise the right if and when Ritchie received "*any* offer to purchase [Ritchie's] interest . . . by a third party." (Emphasis added.) Under the same provision, Waste Connections contracted for the opportunity to exercise its right "on such financial terms" as the third-party offer.

In a right of first refusal situation, each party gives up something in exchange for increased certainty of opportunity to make a deal. The seller gives up its chance to negotiate with the holder of the right of first refusal for a price higher than the one a third party is willing to offer. The holder of the right of first refusal gives up its chance to negotiate with the seller for a price lower than one the seller is willing to accept from a third party. See *Uno Restaurants, Inc. v. Boston Kenmore Realty Group*, 441 Mass. 376, 382-83, 805 N.E.2d 957 (2004) (right holder runs risk that third-party may offer more than holder willing to pay) (citing *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 226 [7th Cir. 1996]). The key to activation of a holder's right of first refusal is mutual willingness to enter into a sale at a specific price satisfactory to both the third party and the seller. The seller may not force a purchase by the holder of the right of first refusal at a higher price. The holder of the right of first refusal may not force a sale to it at a lower price. Room to dicker is effectively circumscribed on both sides of the table by the necessity for price acceptability to the third party. See *Miller*, 87 F.3d at 226; *In re Adelphia Communications Corp.*, 368

B.R. 348, 352-53 (Bankr. S.D.N.Y. 2007); *Uno Restaurants, Inc.*, 441 Mass. at 383. The nature of a right of first refusal agreement means that neither the seller nor the right holder remains free to exercise unfettered business judgment to use the sale of the subject property or other asset to maximize profit or shareholder value. Each has voluntarily constrained such judgment and taken on obligations to the other. See *Navasota Resources v. First Source Texas*, 249 S.W.3d 526, 537-39 (Tex. App. 2008) (no unreasonable restraint on alienation on holding seller to right of first refusal limits).

The inability of the right of first refusal holder, sometimes called a right of pre-emption holder in Kansas, to force a sale by an unwilling seller differentiates a right of first refusal from an option.

"A right of pre-emption differs from an option in that a pre-emption does not give to the pre-emptioner the power to compel an unwilling owner to sell, but merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption at the stipulated price, and upon receiving such an offer, the pre-emptioner may elect whether he will buy, and if he elects not to buy, then the owner of the property may sell to a third party." *Anderson v. Armour & Company*, 205 Kan. 801, Syl. ¶ 1, 473 P.2d 84 (1970).

See also *Miller v. Alexander*, 13 Kan. App. 2d 543, 551-52, 775 P.2d 198, *rev. denied* 245 Kan. 785 (1989).

Because Waste Connections contracted for a right of first refusal, not an option, it did not have the right to force Ritchie to sell if Ritchie was unwilling to sell under the terms of a third-party offer. A seller must form the " 'specific intention to sell' " in order for the right of first refusal to ripen into an " 'enforceable contract right' " or option equivalent. *Anderson*, 205 Kan. at 805 (preemptive right merely requires owner, when and if owner decides to sell, to offer property first to person entitled to preemption); see also *Barnhart v. McKinney*, 235 Kan. 511, 522-23, 682 P.2d 112 (1984) (right of preemption document made property owner's decision to sell trigger of enforceable right); *Bergman v. Commerce Trust Co.*, 35 Kan. App. 2d 301, 306-07, 129 P.3d 624 (2006) (absurd to find that owner unwilling to sell could nevertheless be forced to do so merely because of receipt of offer; when conditions met for exercise of preemptive right, it becomes, in effect, option)

(quoting *Miller*, 13 Kan. App. 2d at 552); *M & M Oil Co. v. Finch*, 7 Kan. App. 2d 208, 210-11, 640 P.2d 317 (1982) (sellers' acceptance of third-party offer needed to activate right). But, here, language in the Escrow Agreement bound Ritchie to convey "any" offer it was willing to accept from Cornejo or another third party to Waste Connections. The offer did not need to be reduced to writing by the third party or set forth in an executed Asset Purchase Agreement to trigger Ritchie's obligation to communicate it in writing and then accept the specified amount in a purchase of the transfer station by Waste Connections.

There is no dispute here that Cornejo made an offer for the transfer station. There also is no dispute about whether Ritchie at some point formed a specific intention to sell the transfer station to Cornejo. There is no dispute whether, at least by the time the Asset Purchase Agreement was signed, Waste Connections' right of first refusal was activated. The fact that the Asset Purchase Agreement was structured in the alternative—either as a package deal for $4.95 million to include both the transfer station and the landfill or as a stand-alone deal for $3.5 million to include only the landfill—does nothing to alter these settled points. Kansas has not previously treated package status as a barrier to activation of a right of first refusal on a portion of the package. See *Anderson*, 205 Kan. at 805 (lessee's preemptive right of purchase for 13.75 acres ripened into enforceable contract right to purchase when lessor found buyer for 30-acre tract including 13.75 acres). And neither party asserts that it should be such a barrier in this case. The only dispute centers on the price at which Waste Connections could purchase only the transfer station. Was that price $2 million or $1.45 million? See *Pantry Pride Enterprises v. Stop & Shop Companies*, 806 F.2d 1227, 1231-32 (4th Cir. 1986) (essential issue in package case to determine actual price offered by third party for encumbered property).

To determine whether this question was properly answered in either party's favor as a matter of law, we look first to the four corners of the Escrow Agreement, the instrument creating the right of first refusal. See *Anderson*, 205 Kan. at 805 (court focuses on language of written right of refusal first); *Bergman*, 35 Kan.

App. 2d at 304-05 (same); *M & M Oil*, 7 Kan. App. 2d at 209-10 (same); see also *In re Adelphia Communications Corp.*, 368 B.R 348 (contract provides for exercise of right of first refusal at price matching third-party offer; court does not interpret contract to call for exercise at fair market value). The Escrow Agreement is silent about price, except to say that the right of first refusal exercise will be "on such financial terms" as the third-party offer. It also is silent about the specific alternative circumstance that arose here, the proposed sale of the transfer station as part of a package deal with the landfill. It gives no hint of the parties' intentions about a package deal's effect or lack of effect on the price Waste Connections must have a chance to match. It makes no allocation and neither authorizes nor prohibits either party's participation in an allocation. Standing alone, the Escrow Agreement entitles neither party to summary judgment.

We turn next to the four corners of the Asset Purchase Agreement between Ritchie and Cornejo, which could have filled in the specific price term not included in the right of first refusal of the Escrow Agreement. Again, the critical passage reads:

"2.1.   Purchase Price and Payment. The purchase price for the entirety of the Assets shall be Four Million Nine Hundred Fifty Thousand Dollars ($4,950,000), payable in cash or certified funds at Closing, of which Two Million Dollars ($2,000,000) will be allocated and paid to Ritchie Corporation for the purchase of its rights and the assumption of its obligations under the Escrow Agreement.

"In the event that Waste Connections of Kansas, Inc. shall, upon receipt of due and proper notice from Sellers, elect to exercise its right of first refusal under the Escrow Agreement, the parties agree that the purchase price for the remaining assets shall be Three Million Five Hundred Thousand Dollars ($3,500,000.00), payable in cash or certified funds at closing."

This passage speaks clearly to only three aspects of price. First, it says that Cornejo was willing to pay and Ritchie was willing to accept $4.95 million for the landfill and transfer station package. Second, if that package deal was consummated, Cornejo and Ritchie agreed that $2 million of the package purchase price would be "allocated and paid" for the transfer station. Third, if, instead, Waste Connections exercised its right of first refusal to purchase

the transfer station, Cornejo was willing to pay and Ritchie was willing to accept $3.5 million for the landfill alone.

This passage does not speak clearly about the amount Cornejo was willing to pay and Ritchie was willing to accept for the transfer station alone, if Waste Connections did not exercise its right of first refusal. The amount may be the same as the $2 million "allocated and paid" in the package deal, but it may also be the same as the $1.45 million difference between the package price of $4.95 million and the stand-alone landfill price of $3.5 million. Without knowing more, we cannot be sure which price Waste Connections must match to exercise its right of first refusal under the Escrow Agreement. Because the Escrow Agreement plus the Asset Purchase Agreement do not settle the matter, despite their integration clauses, we must turn to extrinsic or parol evidence. See *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24 (1992); *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 838-40, 508 P.2d 889 (1973). If such evidence is uncontroverted, it may resolve the ambiguity and still enable judgment as a matter of law for one side or the other. See *Mobile Acres*, 211 Kan. at 840.

At least some of the transcribed deposition testimony of the Cornejo and Ritchie witnesses tends to show that Cornejo was not interested in acquiring the transfer station at all, that it was willing to do so only because Ritchie insisted that the transfer station be packaged with the landfill, and that Cornejo did not care how Ritchie allocated the package purchase price as long as Cornejo did not pay more than $3.5 million for the landfill. It is unclear from the testimony exactly when these various positions were arrived at, how much common ground there was between Cornejo and Ritchie, or if and when that common ground crystallized into "any" offer at $1.45 million or $2 million that had to be communicated under the Escrow Agreement to Waste Connections. Meanwhile, as Ritchie points out, other evidence tends to support the existence of a business justification for its demand for $2 million for the transfer station, as well as an explanation for why the landfill was worth more to Cornejo as a stand-alone acquisition than as part of a package deal. All of this conflicting evidence must be considered

by a factfinder in arriving at the correct right of first refusal exercise price.

In summary, unlike the district judge and our Court of Appeals panel, we do not think the evidence marshaled by the parties in support of their cross-motions for summary declaratory judgment compels only one legal outcome. Rather, we see genuine issues of material fact for trial, making summary declaratory judgment for either party error. See *Mobile Acres*, 211 Kan. at 840. This case must be remanded to the district court so that a factfinder can determine when there was a price for the transfer station that Cornejo was willing to pay and Ritchie was willing to accept; whether that price was $2 million or $1.45 million; and whether Pilgreen's June 27, 2007, letter enclosing the Asset Purchase Agreement was a sufficient and timely communication of the correct offer to Waste Connections. See *Pantry Pride*, 806 F.2d at 1231-32 (remand necessary to determine allocation). If the factfinder decides that the correct transfer station price was $2 million, and that Ritchie's communication of that price to Waste Connections complied with the Escrow Agreement, it will be left with only the question of whether Ritchie nevertheless violated its duty of good faith and fair dealing in some other way that caused damages to Waste Connections. If it decides that the correct price was $1.45 million and/or that Ritchie even innocently failed to communicate that offer properly, there was a breach of contract causing Waste Connections $550,000 in damages; and the further allegation of bad faith need not be addressed.

## The Duty of Good Faith and Fair Dealing

Because the question of good faith and fair dealing may arise on remand, a few comments on the role and requirements of the duty in this case are necessary.

Up to this point, the parties and the lower courts have focused almost exclusively on whether either party is entitled to summary declaratory judgment on the issue of whether Ritchie abided by its duty of good faith and fair dealing under the Escrow Agreement. We believe this approach has shed more heat than light on the path to resolution of this case for at least two reasons.

First, the allegation that Ritchie breached the Escrow Agreement by acting in bad faith is only one of the breaches alleged by Waste Connections. The Amended Petition and Waste Connections' contentions in the Pretrial Conference Order also allege breach of contract generally and in other specific ways independent of the bad faith theory. Not only is Ritchie's good or bad faith not irrevocably central to this case; it may turn out to be irrelevant. A breach is a breach is a breach, even if it occurs with the best of intentions. If, for example, the factfinder determines on remand that Ritchie breached the Escrow Agreement by failing to communicate a $1.45 million Cornejo offer that Ritchie was willing to accept before Pilgreen sent the June 27, 2008, letter, then Ritchie's good or bad faith in delaying notice will not matter. The delay itself will constitute a breach. Waste Connections will not also have to prove that Ritchie intentionally or purposely did something to prevent Waste Connections from exercising its right of first refusal, that it intentionally or purposely did something that had the effect of destroying or injuring Waste Connections' right to receive the fruits of the right of first refusal, or that Ritchie acted arbitrarily or unreasonably. See *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987). These hallmarks of bad faith will not provide further useful benchmarks leading to resolution of the parties' dispute.

Second, we emphasize that the fact question of the existence of good or bad faith is peculiarly inappropriate for summary judgment. See 88 C.J.S. Trial § 358 (whether party acted in good faith typically question of fact). This is especially true here, when we have ambiguity in the Asset Purchase Agreement price term needed to fill in the Escrow Agreement's right of first refusal, and when the record is full of conflicting extrinsic evidence. This state of affairs makes summary judgment on the general breach of contract claim, as well as summary judgment on any subsidiary theory, impossible. We also further note that, even on remand, it is doubtful this case will be a suitable candidate for declaratory judgment to settle the "legal" rights of the parties under the Escrow Agreement. See K.S.A. 60-1701; K.S.A. 60-1704; K.S.A. 60-1713. In essence, the legal rights of the parties are already known: Waste Con-

nections had a right to demand that Ritchie sell the transfer station to it for the same price Cornejo was willing to offer and Ritchie was willing to accept. Again, the remaining question is what the correct match price was, and the parties have narrowed the fact-finder's choices to two: $2 million or $1.45 million. Although factual questions may be answered in a declaratory judgment action, see K.S.A. 60-1710, a court also may decline to enter a declaratory judgment when it is ill-suited to the task at hand. See K.S.A. 60-1708. It appears ill-suited here. See K.S.A. 60-1701; K.S.A. 60-1704; K.S.A. 60-1713.

Should the factfinder reach the duty of good faith and fair dealing on remand, we emphasize that the inherently factual question of whether Ritchie breached the Escrow Agreement by violating the duty is not dependent upon the mere existence of the package deal alternative in the Asset Purchase Agreement or even upon Ritchie's involvement in setting the portion of the package price attributable to the transfer station. None of the cases cited to us by the parties supports either the district court's decision that judgment on good faith must flow to Ritchie as long as it did not engage in arbitrary behavior or collusion with Cornejo or the Court of Appeals panel's decision that judgment in favor of Waste Connections was necessary because an unrebutted presumption of Ritchie's bad faith arose out of the $550,000 difference in the two possible purchase prices.

*Uno Restaurants*, 441 Mass. 376, is an example of a cited case that cannot support the pressure placed upon it by the parties or the lower courts. Ritchie urges us to rely on *Uno Restaurants* for the proposition that a seller must engage in bad faith or collusion with a third party to inflate the price of the property or asset subject to a right of first refusal before a right holder can ever succeed on a breach of contract claim. But this is a substantial overstatement of the *Uno Restaurants* holding.

In that case, a third party made an unsolicited package offer that included allocation of the total sales price to units in the same building, only one of which was encumbered by the right of first refusal. The court rejected the right holder's bad faith-based challenge to the allocated price for the encumbered unit, noting that

there was no evidence the seller influenced the offer total or its allocation while there was evidence of the third party's genuine desire for ownership of the burdened unit and its willingness to outbid the right holder to obtain it. See *Uno Restaurants*, 441 Mass. at 384-87. The court's ultimate conclusion that the right holder did not meet its burden of showing bad faith or collusion in the case before it is a far cry from an edict that such bad faith or collusion is a required component of every attack on price allocation in a package deal. See also *In re Adelphia Communications Corp.*, 368 B.R. at 353 (no allegation that seller manipulated price; evidence that offer price was determined without any consideration given to right of first refusal unrebutted); *Rappaport v. Estate of Banfield*, 181 Vt. 447, 456, 924 A.2d 72 (2007) (court observes no evidence seller influenced third party on amount offered for property burdened by right of first refusal; "[w]hile [seller] may have wanted a certain total price for all of the land[, including the burdened parcel], there is no evidence that she and [third party] discussed how much should be offered for each parcel; [t]o the contrary, the undisputed evidence shows that [third party] made this decision himself"); compare *M & M Oil*, 7 Kan. App. 2d at 210 (court mentions no allegation of bad faith; nevertheless, court observes sellers did not solicit third-party offer, allocation dictated by nothing other than third party's business judgment). Good or bad faith may come into play in such a case, but they may not. As here, other bases for breach of contract may be alleged.

In this case, of course, there is evidence that Ritchie not only influenced the allocation in the Asset Purchase Agreement but may have arrived at it without any meaningful input from Cornejo. And there can be little question that, if the factfinder determines that Ritchie was attempting to thwart Waste Connections' right of first refusal by padding the price of the transfer station, no matter how it achieved that end, there was a breach of the duty of good faith inherent in the Escrow Agreement. We are far from blind to our sister courts' recognition that package deals in which a portion of the subject property is subject to a right of first refusal have the potential for artificial allocations to defeat or promote exercise of the right. See, *e.g.*, *Pantry Pride*, 806 F.2d at 1230-31. But whether

the allocation in the Asset Purchase Agreement before us was artificial and whether Ritchie's role in arriving at it amounted to breach of the Escrow Agreement because it constituted violation of the duty of good faith and fair dealing are just two possibilities for breach, just two among several genuine issues of material fact remaining for trial in this case.

*Costs, Expenses, and Reasonable Attorney Fees*

The parties have correctly observed that the Escrow Agreement provides for an award of costs, expenses, and reasonable attorney fees to the party prevailing in any dispute arising out of it. As there is no such party at this point, the district judge's award of $108,972.15 to Ritchie is premature and must be reversed.

Both parties also seek attorney fees incurred on this appeal, pursuant to Supreme Court Rule 7.07(b) (2012 Kan Ct. R. Annot. 66). We may award such fees when "the district court had authority to award" them. Because the district court did not yet have such authority, the parties' cross-motions for fees on this appeal are denied on current showing.

## CONCLUSION

In our view, the legal rule that should govern this case on remand and future similar cases demands more than the district judge appears to have demanded from a seller in Ritchie's position and more than the Court of Appeals panel appears to have demanded from a right of first refusal holder in Waste Connections' position. Ritchie must have abided by the terms of the Escrow Agreement's right of first refusal in all respects, not just by observing its implied duty of good faith and fair dealing. Behavior short of arbitrary or collusive, even innocent behavior, may have constituted breach. Because Ritchie voluntarily surrendered its unfettered judgment when it signed the Escrow Agreement containing the right of first refusal, it does not inevitably escape liability simply by invoking its business judgment and profit maximization goals. Waste Connections also must have abided fully by the Escrow Agreement; it does not get the benefit of a presumption of Ritchie's breach or bad faith from ambiguous price language in the Asset Purchase Agree-

ment. Such a presumption fails to recognize the legitimate role of a seller's intention to sell in activation and exercise of a right of first refusal. If package deal configuration or the lack of it or some other aspect of a third-party's offer makes it unacceptable to the seller, that does not necessarily mean that the seller breached the right of first refusal by violating the duty of good faith and fair dealing or otherwise. In short, ordinary contract principles govern, and all facts are to be taken into account in determining the correct price for the transfer station.

Because genuine issues of material fact remain on Waste Connections' breach of contract action against Ritchie, summary judgment for either party is inappropriate. This case must be returned to the district court for further proceedings.

The decision of the Court of Appeals is reversed. The judgment of the district court is reversed. This case is remanded to the district court for further proceedings consistent with this opinion.

MORITZ, J., not participating.

PATRICIA MACKE DICK, District Judge, assigned.