NOT DESIGNATED FOR PUBLICATION

No. 122,903

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CONWAY BANK,
*Appellee,*

v.

O'BRATE REALTY, LLC,
*Appellant.*


MEMORANDUM OPINION

Appeal from Harper District Court; R. SCOTT MCQUIN, judge. Opinion filed December 23, 2021. Affirmed.

*Thomas B. Diehl*, of Ralston, Pope & Diehl, LLC, of Topeka, and *Benjamin Jackson*, of Jackson Legal Group, LLC, of Scott City, for appellant.

*H. Douglas Pfalzgraf*, of Pfalzgraf Law Office, of Wellington, for appellee.

Before GARDNER, P.J., GREEN and BUSER, JJ.

BUSER, J.:  This is an appeal by O'Brate Realty, LLC from the district court's judgment entered against it and in favor of Conway Bank. After a bench trial, the district court ruled that O'Brate Realty and Barbara Shrum had entered into a "Transfer/Purchase of Membership Interests" agreement (Agreement). This Agreement provided that Shrum transfer her membership shares in Harper Hotel Group, LLC (Harper Group) to O'Brate Realty. In return, according to Conway Bank, O'Brate Realty agreed to assume the $50,000 obligation that Shrum had personally guaranteed (Shrum Guaranty) to facilitate the Harper Group's obtaining a loan from The Farmers and Merchants State Bank of

1

Argonia (Farmers Bank), later Conway Bank. Conway Bank sued O'Brate Realty on the Shrum Guaranty, and the district court entered judgment in the amount of $50,000 and attorney fees against O'Brate Realty and in favor of Conway Bank. Upon our review, we affirm the judgment and award attorney fees to Conway Bank.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2013, the Harper Group executed a promissory note with Farmers Bank in the amount of $1,740,000 to fund a hotel construction project in Harper, Kansas. Cecil O'Brate, O'Brate Realty, and Barbara Shrum were members of the Harper Group. The Harper Group had several other members, and each one signed the promissory note.

Additionally, as part of this lending transaction, Cecil, O'Brate Realty, Shrum, and other members of the Harper Group, executed personal guaranties with Farmers Bank in amounts equal to their initial investment with the Harper Group. Sharon Brozovich, the former president of Farmers Bank, testified that the personal guaranties were part of a bank policy that required any LLC, such as Harper Group, to have its members guarantee debts. Brozovich said that Farmers would not have loaned the Harper Group money without the personal guaranty of each member.

Accordingly, Shrum executed her personal guaranty with Farmers Bank for $50,000, which equaled her initial investment with the Harper Group in the hotel. In relevant part, the Shrum Guaranty included the following provisions:

"2. SPECIFIC AND FUTURE DEBT GUARANTY. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce you [Farmer's Bank], at your option, to make loans or engage in any other transactions with the Borrower from time to time, I [Shrum] absolutely and unconditionally agree to all terms of and guaranty to you the payment and performance of each and every Debt, of every type, purpose and description that the Borrower either

2

individually, among all or a portion of themselves, or with others, may now or at any time in the future owe you, including, but not limited to the following described Debt(s) including without limitation, all principal, accrued interest, attorneys' fees and collections costs, when allowed by law, that may become due from the Borrower to you in collecting and enforcing the Debt and all other agreements with respect to the Borrower.

"A promissory note or other agreement, No. 21178 F 17 CB 10, dated May 17, 2013, from HARPER HOTEL GROUP, LLC (Borrower) to you, in the amount of $1,740,000.00.

. . . .

"My liability will not exceed $50,000.00 of the principal amount outstanding at default, plus accrued interest, attorneys' fees and collections costs, when allowed by law, and all other costs, fees and expenses agreed to be paid under all agreements evidencing the Debt and securing the payment of the Debt. You may, without notice, apply this Guaranty to such Debt of the Borrower as you may select from time to time.

In October 2017, the Office of the State Bank Commissioner of Kansas closed Farmers Bank and the Federal Deposit Insurance Corporation (FDIC) assumed control of the financial institution. Conway Bank later purchased the assets of the Farmers Bank from the FDIC. The purchase included the promissory note between Farmers and the Harper Group, and the personal guaranties executed by its members.

One month later, on November 7, 2017, Shrum, Cecil, and O'Brate Realty entered into the Agreement. The Agreement lists Shrum as the seller, and Cecil, as an individual, and O'Brate Realty as the buyers. In relevant part the Agreement provided:

"1.       The Seller is a member of the Harper Hotel Group, LLC and purchased two (2) Membership Units in the Harper Hotel Group Limited Liability Company for a total of one hundred thousand [(]$100,000) dollars. Member hereby voluntarily transfers and conveys for value and consideration, to Cecil O'Brate, an individual, and O'Brate Realty

3

LLC, who is also a member of the Harper Hotel Group, LLC, her two (2) Membership Units. This transfer is intended to be Permitted Transfer in compliance with the Operating Agreement of Harper Hotel Group, LLC dated November 2, 2012.

"2.     This transfer and conveyance of the two (2) Membership Units is [effective] on the 7th day of November, 2017.

"3.     Buyer agrees to also take any debt associated to the Seller as his own and to specifically hold Seller harmless as to the debt owed by the Harper Hotel Group, LLC to Farmers & Merchants Bank of Argonia, Kansas."

By stipulation in the pretrial order, Conway Bank agreed not to pursue Cecil in his individual capacity for payment of the Shrum Guaranty. Thus, the only buyer in the Agreement pertinent to the appeal is O'Brate Realty.

The Harper Group defaulted on the promissory note, and the hotel was sold. On April 20, 2018, after the sale of the hotel, Conway Bank sent a letter to various members of the Harper Group stating the loan balance as of April 18, 2018, the net proceeds from the sale, and the total amount remaining on the loan after the proceeds were subtracted from the loan balance. The letter demanded payment of the members' personal guaranties. Although Shrum was not contacted, a demand letter was sent to O'Brate Realty regarding the $50,000 Shrum Guaranty which Conway Bank asserted O'Brate Realty had assumed under terms of the Agreement.

Conway Bank later sued O'Brate Realty on its original guaranty and the Shrum Guaranty. After the lawsuit was filed, O'Brate Realty satisfied its guaranty by paying Conway Bank the full amount of its original obligation. As a result, the O'Brate Realty guaranty has no bearing on this appeal. The O'Brate Realty guaranty payment was tendered, however, with the express reservation that the litigation would continue as to

4

the Shrum Guaranty, since O'Brate Realty maintained it was not liable for payment of that guaranty.

After discovery, Conway Bank filed a motion for summary judgment which was opposed by O'Brate Realty. The district court granted the motion. The district court later reconsidered its ruling, however, and denied the motion. According to the district court, there were "factual issues regarding the assignment of the guarantee and the crediting of payments on the debt owed the bank."

A bench trial was held in February 2020, with the district judge ruling in favor of Conway Bank:

> "With regard to the assignment of the Shrum . . . guaranty over to O'Brate Realty, LLC, I don't think Plaintiff's Exhibit 12 [Agreement] is ambiguous. It clearly shows in that Paragraph 3 the intention to—for O'Brate Realty, LLC, to take any debt associated to the seller. Specifically, hold the seller harmless as to the debt owed by the [Harper Group] to [Farmers Bank]. The agreement saying you could assign the guaranties. That was done.
>
> "I think the plaintiff has proven their case and they're entitled to a judgment for the [$]50,000.
>
> "Per the agreements, they're entitled to attorney's fees."

The district court ordered O'Brate Realty to pay $16,471.77 in attorney fees. O'Brate Realty did not dispute the reasonableness of the fees but reserved the right to contest whether they were legally obligated to pay any attorney fees.

O'Brate Realty timely appeals. It asks our court to vacate the judgment and remand the case with directions for the district court to enter judgment in favor of O'Brate Realty.

5

## DID THE AGREEMENT ASSIGN LIABILITY
## UNDER THE SHRUM GUARANTY TO O'BRATE REALTY?

On appeal, O'Brate Realty presents the following question for our determination: "[W]hether the Agreement executed between Shrum, Mr. O'Brate, and Defendant O'Brate Realty transferred and assigned liability under the Shrum Guaranty to Defendant O'Brate Realty." In answering this question, O'Brate Realty principally argues that

"a personal guaranty is not a debt; that no personal guaranty was transferred or assigned to it by virtue of the Agreement; and that the Agreement itself is legally insufficient to transfer or assign a personal guaranty, or, in the alternative, is vague and ambiguous as to whether a personal guaranty was transferred and assigned."

Conway Bank responds:

"Actually, the narrowness of this appeal should be further defined . . . specifically, O'Brate [Realty] tellingly at page 12 of its brief states, '*Here* [*O'Brate Realty*] *does not dispute the validity of the Shrum Guaranty itself. Shrum* (*the guarantor*) *guaranteed the debt of the Harper Group* (*the debtor*) *to Famer's Bank* (*the creditor*) *with a maximum liability of $50,000.* [*O'Brate Realty*] *further does not dispute that the Shrum Guaranty was purchased or assumed by Plaintiff Conway Bank*.' The only legal issue herein goes to the assignment document, and the precise issue is whether the clear language therein is eviscerated by the desired interpretation advanced by O'Brate [Realty] in its briefing."

"The rules governing the interpretation and construction of contracts generally apply to the interpretation or construction of contracts of guaranty." *Botkin v. Security State Bank*, 281 Kan. 243, Syl. ¶ 2, 130 P.3d 92 (2006). "'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.' [Citation omitted.]" *Peterson v. Ferrell*, 302 Kan. 99, 104-05, 349 P.3d 1269 (2015).

At the outset, it is necessary to understand what is meant by the term "guaranty." In *Trego WaKeeney State Bank v. Maier*, 214 Kan. 169, 173, 519 P.2d 743 (1974), our Supreme Court explained:

> "A guaranty is a contract between two or more persons, founded upon consideration, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking. The contract of a guarantor is his own separate contract. It is in the nature of a warranty by him that the thing guaranteed to be done by the principal shall be done, and is not an engagement jointly with the principal to do the thing. A guarantor, not being a joint contractor with the principal, is not bound like a surety to do what the principal had contracted to do, but answers only for the default of the principal. The original contract of his principal is not his contract. [Citation omitted.]"

In other words:

> "A guaranty involves least three parties: a guarantor; a creditor; and a debtor and includes two different obligations: that of the principal debtor and that of the guarantor. The party executing the guaranty is called the guarantor who promises to pay the debt or perform some duty in the event of the failure of another who is primarily liable for that payment or performance. The one to whom the guaranty is given is the guarantee or creditor, and the person whose debt, conduct, or contract is guaranteed is known as the principal (or principal debtor). A person cannot be both the principal debtor and the guarantor since an agreement to guarantee a debt and an agreement to be the original promisor are mutually exclusive." 38A C.J.S., Guaranty § 2.

Based on these definitions, the role of the parties involved in the litigation on appeal are easily understood. When the original promissory note was executed in 2013, Farmers Bank was the creditor, the Harper Group was the debtor, and Shrum was the guarantor. By the time the case went to trial in 2020, the parties had changed. By purchasing the loans of Farmers Bank from the FDIC, Conway Bank became the creditor

7

while the Harper Group remained the debtor. The critical question: Was Shrum still the guarantor or—presuming O'Brate Realty assumed the Shrum Guaranty—was O'Brate liable to pay Conway Bank $50,000 on the Shrum guaranty?

O'Brate Realty acknowledges it "does not dispute that the Shrum Guaranty was appropriately purchased or assumed by Plaintiff Conway Bank." O'Brate Realty also "does not dispute the validity of the Shrum Guaranty itself." However, O'Brate Realty challenges "that the Shrum Guaranty was transferred to, assigned to, or assumed by [it]."

The Agreement between Shrum and O'Brate Realty consists of a one-page, three paragraph, seven sentence document that lists Shrum as the seller, and Cecil and O'Brate Realty as the buyer. The first paragraph stated that Shrum transferred and conveyed her two membership units in the Harper Group, that she had purchased for $100,000. The third paragraph of the Agreement, particularly relevant to this appeal, simply provides: "Buyer *agrees to also take any debt associated to the Seller as his own* and to specifically hold Seller harmless as to the debt owed by the [Harper Group] to [Farmers Bank]." (Emphasis added.)

The district court ruled the Agreement was unambiguous. It held the Agreement "clearly shows in that Paragraph 3 the intention to—for O'Brate Realty, LLC to take any debt associated to the seller." It should be noted that an appellate court is not bound by the lower court's interpretations or rulings. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

For their part, the parties agree with the district court that the Agreement's language is unambiguous. However, the parties understanding of the unambiguous meaning of "Buyer agrees to also take any debt associated to the Seller as his own" is totally at variance with one another. Conway Bank argues that the phrase "any debt" in the Agreement unambiguously refers to the Shrum Guaranty, while O'Brate Realty

8

argues that the Agreement does not mention the word "guaranty" and that a "debt" is not a "guaranty." Importantly, "the parties' agreement or lack of agreement on the existence of ambiguity does not compel the court to arrive at the same conclusion." *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013).

At the outset, we must determine whether the Agreement is ambiguous. Whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections*, 296 Kan. at 964. "Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced. The intent of the parties is determined from the four corners of an unambiguous instrument, harmonizing the language therein if possible." *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000).

We are persuaded that the Agreement is ambiguous. As highlighted by O'Brate Realty, the Agreement did not mention the Shrum Guaranty or any guaranty. Moreover, the term "debt" is not defined in the Agreement. O'Brate Realty argues: "A guaranty is not a debt; a debt is not a guaranty. Where a contingency which may trigger liability under a guaranty has not occurred, there is no obligation under the guaranty. That is to say, there is no debt."

On the other hand, the Agreement relates to Shrum's membership interest in the Harper Hotel Group which was indebted to Farmer's Bank on the promissory note, and for which Shrum, as part of that transaction, had executed a personal guaranty of "the payment and performance of each and every Debt, of every type, purpose and description that the Borrower . . . may now or at any time in the future owe you . . . ."

Given the sparse language and undefined terminology in the Agreement, we conclude the intent of the parties is not clear from the four corners of the document. The significance of this finding is that when "the court determines that a written contract's

9

language is ambiguous, extrinsic or parol evidence may be considered to construe it." *Waste Connections*, 296 Kan. at 963. In this regard, we have reviewed the trial transcript, exhibits, and considered parol evidence that convinces us that the parties intended for O'Brate Realty to be liable for Shrum's $50,000 guaranty to Farmer's Bank, later Conway Bank.

Our analysis is limited by the fact that the two individuals who could provide first-hand testimony regarding their intent in executing the Agreement, Shrum and Cecil, did not testify at trial. O'Brate Realty attempted to elicit testimony from H. J. Swender Jr., vice president and manager of O'Brate Realty, regarding the company's understanding of the Agreement. This testimony was disallowed as hearsay under K.S.A. 60-460, however, and O'Brate Realty did not appeal the evidentiary ruling. Nonetheless, other evidence presented at trial ameliorates the Agreement's ambiguity and shows the parties' intent to transfer the Shrum Guaranty to O'Brate Realty. There are four reasons for our conclusion.

First, at or about the time of the execution of the Agreement, it was readily apparent that Conway Bank was enforcing the payment of loan guaranties, like the one Shrum had executed. At the time the Agreement was executed on November 7, 2017, the promissory note had been in default or past due status on several occasions since 2015. The note also had been extended and, on February 27, 2017, it was modified to terms more favorable to the Harper Group to facilitate payments on the note. According to Brozovich, the note was a "troubled asset" that "went in and out of default several times." Subsequently, FDIC regulators spent about one year investigating the lending practices and troubled assets of Farmer's Bank before Brozovich resigned in July 2017. The FDIC subsequently took over the bank's operations, placed it in receivership, and on October 13, 2017, Conway Bank purchased the bank's assets from the FDIC.

With the changeover in bank ownership and the hotel having been sold for significantly less than the loan amount, the promissory note was in default, and meetings

10

were held involving Conway Bank officials and debtors and guarantors regarding payment of the loan and guaranties. About this time, on November 7, 2017, Shrum and O'Brate Realty executed the Agreement. Should there be any doubt that during this period Conway Bank was instituting collection efforts on the personal guaranties of the Harper Group members, on December 15, 2017, the bank sought and received $100,000 of Cecil's guaranty.

A few months later, Conway Bank sent numerous demand letters to other members of the Harper Group seeking payment of their respective guaranties. In short, about the time the Agreement was executed, Conway Bank was enforcing the payment of the individual members' loan guaranties.

On appeal, O'Brate Realty acknowledges that "[a]t best, the Agreement . . . recognizes that, at some point, [Shrum] may owe a debt related to the Harper Group." But the Shrum Guaranty defined "debt" as "debts, liabilities, and obligations of the Borrower . . . whether now existing or created or incurred in the future, *due or to become due*, or absolute or contingent . . . ." (Emphasis added.) Conway Bank's takeover, the sale of the hotel leaving a loan deficiency, and the bank's efforts to enforce the members' guaranties at about the time the Agreement was executed make clear that Shrum was indebted to the bank. Shrum's promise in her guaranty that "I am unconditionally liable under this Guaranty" was, at the time the Agreement was executed, a clear and present obligation or debt that she was required to pay.

Second, against this foreboding financial backdrop, evidence at trial established that about this time, Shrum was unable to fulfill her promise to pay the guaranty. Ronald D. Carr, the chief lending officer of Conway Bank who worked on problem assets related to the former Farmer's Bank testified, "I knew Barbara Shrum had no ability to pay." Given Conway Bank's enforcement actions to collect on the Harper Group members'

11

guaranties and Shrum's inability to pay, Shrum had an imperative to alleviate her financial liability on the guaranty.

Third, O'Brate Realty's promise to "take any debt associated to" Shrum comprised important consideration for Shrum to transfer her two membership units back to Harper Realty. Swender, although not employed by O'Brate Realty at the time of the signing of the Agreement, testified to his knowledge of the transaction. According to Swender, O'Brate Realty informed Shrum "we weren't interested" in paying her $100,00 for her two membership units which she had purchased for that amount. Although the Agreement stated that the transfer of the membership units was for "value and consideration," when asked how much O'Brate Realty agreed to pay Shrum for her transfer of the membership units, Swender replied, "Zero."

O'Brate Realty's only consideration for the transfer of Shrum's membership units, therefore, consisted of its agreement to take any debt associated to Shrum and to hold Shrum harmless as to the debt owed by the Harper Group. This suggests that the language relating to "any debt associated to" Shrum was purposeful and not illusory or merely boilerplate wording. O'Brate Realty's assumption of Shrum's liability for her debt was part and parcel of the consideration and value Shrum received in return for her transfer of the two membership units.

Fourth, Carr testified about Shrum's debt owed to the bank, in particular, the debt referenced in the Guaranty.

> "Q.  The guaranty in question, Exhibit 2, was the only debt Miss Shrum owed individually to either Farmers and Merchants and then Conway Bank as it relates to the Harper Hotel Group? Is that correct?
> "A.  Yes.
> "Q.  So by implication the only debt that that could possibly refer to at least from the bank's records on the Assumption Agreement is this 50,000-dollar guaranty, Exhibit 2?

12

"A. Correct."

Carr's testimony established that the only personal indebtedness Shrum had in relation to Farmers Bank or Conway Bank and the Harper Group was her $50,000 personal guaranty. As a result, the only "debt associated to" Shrum to which the Agreement could possibly reference is the Shrum Guaranty.

These four reasons, based on the Agreement's language, and direct and circumstantial evidence presented at trial, persuade us that at the time the Agreement was executed, the parties intended for O'Brate Realty to assume the Shrum Guaranty. "'The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.' [Citations omitted.]" *Waste Connections*, 296 Kan. at 963. In our view, given the trial evidence, this is the only reasonable interpretation of the Agreement consonant with its terms and the parol evidence presented at trial.

In the alternative, O'Brate Realty argues that the Agreement is unenforceable because it is missing essential and material terms. But O'Brate Realty's argument is undercut by the fact that it cites to cases dealing with the *creation* of a guaranty, not a *transfer or assignment* of one.

For example, O'Brate Realty cites in support, *Kutilek v. Union National Bank of Wichita*, 213 Kan. 407, 411-12, 516 P.2d 979 (1973), wherein our Supreme Court held that a guaranty was unenforceable under the statute of frauds because it contained two blanks when it was signed; one to indicate the loan amount requested, and the other to indicate the total limit of the guarantor's liability. In another case cited by O'Brate Realty, *Walton v. Piqua State Bank*, 204 Kan. 741, 466 P.2d 316 (1970), the guaranty had numerous blanks when it was executed and failed to, among other things, properly

13

identify the other party to the contract or state whose debt was guaranteed for what amount. Thus, it was unenforceable under the statute of frauds. 204 Kan. at 748.

These cases properly set forth Kansas law regarding the construction or interpretation of guaranties. But this precedent relates to guaranties, not transfers or assignments of guaranties. O'Brate Realty acknowledges the distinction between the creation of a guaranty and the assignment of one, but it asserts that, since Kansas courts have held the omission of essential and material terms renders a guaranty unenforceable, "[i]t stands to reason, then, that the omission of similar terms in an alleged guaranty assignment or transfer agreement would make said agreement void and unenforceable as a matter of law as to the alleged assignee." O'Brate Realty fails to cite any on-point support for this assertion.

Our court has previously stated:

"'A valid assignment must contain clear evidence of the intent to transfer rights, must describe the subject matter of the assignment, must be clear and unequivocal, and must be noticed to the obligor.' '[I]n determining whether an assignment has occurred, the courts look to the substance, rather than the form.' 'No particular words or special form of words are necessary to effect an assignment in the absence of statutory provisions prescribing a particular mode or form.' [Citations omitted.]" *Johnson County Bank*, 28 Kan. App. 2d at 11.

As we have found, the Agreement—albeit ambiguous—still contains essential and material terms capable of reasonable interpretation that permits discernment of the parties' intention in transacting the Agreement. Under the circumstances, this is sufficient to effectuate O'Brate Realty's assumption of Shrum's debt under the Guaranty. We do not find O'Brate Realty's alternative argument persuasive.

Finally, O'Brate Realty argues in the alternative that the Agreement should be construed as a hold harmless or indemnity agreement instead of an assignment of the Shrum Guaranty. Like its earlier argument regarding debts and guaranties, O'Brate Realty asserts that guaranties and indemnity agreements are inherently different and have different obligations.

To support its argument, O'Brate Realty cites to *In re Dvorak*, 176 B.R. 929, 933 (Bankr. D. Kan. 1994) to differentiate between an indemnity agreement and a guaranty. There, the court stated that "an indemnity agreement [is not] an evidence of indebtedness. At the time the indemnity agreement is entered into, there is no debt. The indemnitor is not indebted in any way to the indemnitee." *Dvorak*, 176 B.R. at 934. O'Brate Realty also cites *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 642, 666 P.2d 192 (1983), where our Supreme Court stated that "[t]here are two traditional situations in which claims of indemnity are allowed. The first occurs where there is an expressed contract of indemnity, such as a 'hold harmless' agreement."

Based on these cases, O'Brate Realty claims that paragraph 3 of the Agreement should be construed as a hold harmless agreement because it contains those words. As before, O'Brate Realty also asserts that Shrum had no debt when executing the Agreement. Further, it argues that Conway Bank is not a party to the Agreement between O'Brate Realty and Shrum. Thus, O'Brate Realty argues that Conway Bank does not have any legal claim against it to collect the Shrum Guaranty.

O'Brate Realty's argument overlooks the first part of the disputed third paragraph of the Agreement which states: "*Buyer agrees to also take any debt associated to the Seller as his own* and to specifically hold Seller harmless as to the debt owed by the Harper Hotel Group LLC to Farmers & Merchants Bank of Argonia, Kansas." (Emphasis added.) The language of the Agreement memorializes that O'Brate Realty obligated itself to take any debt associated to Shrum and hold Shrum harmless as to the debt owed by the

15

Harper Group. Thus, the Agreement bound O'Brate Realty to assume Shrum's personal Guaranty, *and* to hold her harmless for the debt incurred by the Harper Group in which she had a financial interest.

Moreover, the "Unconditional Liability" provision in the Shrum Guaranty states:

"I am unconditionally liable under this Guaranty, regardless of whether or not you pursue any of your remedies against the Borrower, against any other maker, surety, guarantor or endorser of the Debt or against any Property. You may sue me alone, or anyone else who is obligated on this Guaranty, or any number of us together, to collect the Debt."

Under the terms of this provision, Conway Bank was not obligated to attempt to collect from Shrum before attempting to collect from O'Brate Realty because O'Brate Realty was obligated under the Shrum Guaranty by virtue of the Agreement. Moreover, O'Brate Realty's argument on this issue contradicts its earlier statements that it "does not dispute the validity of the Shrum Guaranty itself" or "that the Shrum Guaranty was appropriately purchased or assumed by Plaintiff Conway Bank." Taken together, Conway Bank, as the entity that purchased the promissory note and accompanying personal guaranties from the members of the Harper Group, has a legal claim to collect on the Shrum Guaranty.

In *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, 313, 856 P.2d 111 (1993), our Supreme Court found that "[a]n assumption agreement is an act of assuming or taking an obligation on one's self and can include the undertaking or adoption of a debt or obligation resting upon another." Since O'Brate Realty assumed the Shrum Guaranty when it entered into the Agreement, Conway Bank may collect the monies promised under the Shrum Guaranty.

In conclusion, for all the reasons stated, we affirm the district court's judgment in favor of Conway Bank regarding O'Brate Realty's assumption of the Shrum Guaranty. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015) (If a district court reaches the correct result, its decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision.).

## CONWAY BANK IS ENTITLED TO ATTORNEY FEES

The district court ordered O'Brate Realty to pay $16,471.77 in attorney fees and costs. O'Brate Realty did not dispute the amount of the award but disputed that the attorney fees were payable at all. On appeal, O'Brate Realty argues that attorney fees are not warranted because it did not assume liability for the Shrum Guaranty under the Agreement.

The Shrum Guaranty included a specific paragraph entitled "Collection Expenses and Attorneys' Fees," which states:

> "On or after the occurrence of an Event of Default, to the extent permitted by law, I agree to pay all expenses of collection, enforcement or protection of your rights and remedies under this Guaranty or any other document relating to the Debt. To the extent permitted by law, expenses include, but are not limited to, reasonable attorneys' fees, court costs and other legal expenses."

Given our holding that O'Brate Realty assumed the Shrum Guaranty under the terms of the Agreement, we affirm the district court's award of attorney fees and costs as provided in the Shrum Guaranty.

Affirmed.