No. 122,254

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GABRYELLE GILLIAM,
*Appellee*,

v.

KANSAS STATE FAIR BOARD,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 77-613(e) requires an administrative agency's final order to identify the agency officer who will receive service of a petition for judicial review on behalf of the agency. The 30-day jurisdictional period for filing a petition for judicial review begins to run after service of an order that complies with K.S.A. 77-613(e).

2.

It is not the function of a court to read sections of a written document in isolation or highlight awkward phrasing. Instead, courts must endeavor to interpret written language in a reasonable fashion that does not vitiate the purpose of the writing or reach an absurd result.

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed May 6, 2022. Reversed.

*M.J. Willoughby*, assistant attorney general, and *Derek Schmidt,* attorney general, for appellant.

*Christopher A. McElgunn*, of Klenda Austerman LLC, of Wichita, for appellee.

Before WARNER, P.J., CLINE, J., and RICHARD B. WALKER, S.J.

1

WARNER, J.: Gabryelle Gilliam's lamb was crowned grand champion of the market-lamb competition at the 2016 Kansas State Fair. Winning this competition is a boon to the animal's owner but less gratifying for the animal itself: The owner receives the recognition of the title, a championship belt buckle, and a cash prize, while the animal is slaughtered within days and its meat sold to market.

After the animal is processed, its carcass is examined by a veterinarian to ensure compliance with the State Fair rules. When Gilliam's lamb was slaughtered in September 2016, a veterinarian observed multiple injections marks on the back of both its hind legs. A joint committee of the Kansas State Fair Board determined that these injection sites were evidence of "unethical fitting"—unfairly changing the animal's natural appearance for the competition. The committee recommended disqualifying Gilliam's entry and canceling her award. The Board accepted that recommendation and informed Gilliam and her father of its decision.

Because the Board is a state agency, Gilliam was able to appeal the Board's decision to the Reno County District Court under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. The district court reviewed the administrative record and reversed the Board's decision, interpreting the State Fair rules to require a veterinarian—and not the Board or some other entity—to determine that an animal has been unethically fitted before the animal (and the animal's owner) can be disqualified from the fair.

The Board now appeals, raising several jurisdictional and legal challenges to the district court's decision. After carefully considering the parties' arguments and the record before us, we find that the district court erroneously interpreted the 2016 State Fair rules and employed an incorrect standard when it reviewed Gilliam's case. We therefore reverse the district court's ruling and affirm the Board's decision to disqualify Gilliam and her lamb from the 2016 competition.

FACTUAL AND PROCEDURAL BACKGROUND

Gilliam registered multiple lambs in the 2016 Kansas State Fair's market-lamb competition. Gilliam, who was 18 years old and in college at Kansas State University, had taken part in fairs for several years; the 2016 State Fair was the last year she would be eligible to compete. When she registered her lambs, she agreed to abide by the Kansas State Fair rules and the International Association of Fairs and Expositions National Code of Show Ring Ethics. Both sets of rules prohibit exhibitors from altering a show animal's natural contours or conformation—a practice the fair rules label "unethical fitting." A determination of unethical fitting results in disqualification of the competitor and animal, as well as forfeiture of any titles and prizes.

Gilliam checked in her lambs at the fair on September 9, 2016, and showed them the next day. During the fair's Grand Drive, one of Gilliam's lambs—Lamb 11824—was crowned grand champion. This victory does not merely confer the "grand champion" title; the owner of the lamb also receives a belt buckle and $4,000 in prize money.

After the market-lamb competition, the fair immediately acquires ownership of the grand champion animal. Grand champions are generally kept on display throughout the fair before being slaughtered. But for some undisclosed reason, Lamb 11824 was processed while the 2016 State Fair was still taking place.

Dr. Paul Grosdidier, a veterinarian with the Kansas Department of Agriculture, was present during the slaughter. While inspecting the carcass of Gilliam's lamb, the veterinarian discovered areas of discoloration and swelling in the muscle and fat on the back of both hind legs and abnormal reddening of the skin over those areas. He concluded that multiple recent injections had likely caused these abnormalities.

3

Curiously, however, lab tests did not identify any drugs in the lamb's system. The veterinarian summarized his observations in a written report to the fair's general manager.

In November 2016, the fair's general manager informed Gilliam that her lamb had been disqualified due to unethical fitting. Gilliam initiated a protest to challenge this decision, and two committees of the Kansas State Fair Board—the Committee on Competitive Rules and the Committee on Youth—held a joint hearing to consider her appeal the following month. Both Gilliam and her father were present at the hearing. Gilliam spoke little, but her father addressed the committee members and denied the Gilliams had injected the lamb. He suggested that a competitor who had access to the lamb after it had been crowned might have been involved in nefarious conduct. And he pointed out that the veterinarian's report only identified injections and discoloration; it did not specifically conclude that the injections constituted unethical fitting or otherwise violated the fair rules.

Dr. Grosdidier also appeared at the hearing, explaining that his "big concern was the . . . obvious injection sites in the back legs." The veterinarian described his observations and explained the abnormalities and discoloration were reactions caused by a muscular injection, not simply a puncture. Although he would not speculate about what had been injected, he believed the injections had occurred within a week of his inspection—and given the redness and degree of swelling, the injections likely occurred only a few days before.

The members of the joint committee discussed these observations, as well as the fact that no drugs were detected in the lamb's drug test, and the various inferences that could be drawn from these circumstances. The Gilliams also participated in these discussions. One committee member—Jackie McClaskey, who was then the Secretary of the Kansas Department of Agriculture—noted that testing could only identify the presence of drug residue, not naturally occurring substances. She also explained that,

4

based on her discussions with Dr. Grosdidier, the absence of drug residue suggested the purpose of the injection was to alter the lamb's appearance, rather than treat an illness. Another committee member observed that the only purpose he could infer from the multiple injection sites was to "enhance the animal . . . in some way, shape, or form" for "showing the animal."

Once the committee members had discussed the evidence presented, they voted on the appropriate action to be taken. The committee ultimately recommended that the Board should uphold the decision to disqualify Gilliam's lamb for unethical fitting. Secretary McClaskey abstained from the committee's vote since the veterinarian was an employee of the Department of Agriculture.

The Board considered Gilliam's protest at its meeting in January 2017. Gilliam, now represented by an attorney, attended the meeting and addressed the Board. The record does not include a transcript of what precisely occurred, but the meeting minutes show—contrary to her father's earlier statements to the joint committee—that Gilliam told the Board she had given Lamb 11824 a vitamin B-12 injection before the competition.

The Board adopted the joint committee's recommendation and disqualified Gilliam's entry of Lamb 11824, informing Gilliam and her attorney of its decision by letter on January 17, 2017. This letter did not identify the person who should be served if Gilliam decided to petition the district court for judicial review. The fair's general manager sent Gilliam an additional letter with this information on March 17, 2017, informing Gilliam that its previous letter was a final agency action.

On April 17, 2017, Gilliam filed a petition seeking judicial review of the Board's decision disqualifying her lamb and forfeiting her belt buckle and prize money. After a nonevidentiary hearing, the district court reversed the Board's decision. The court

concluded the veterinarian's findings provided "some evidence" to support the Board's decision but did not constitute "substantial evidence." More specifically, the district court interpreted the State Fair rules to require the veterinarian—not the general manager, joint committee, or Board—to make a declaration that an act constitutes unethical fitting before an entry can be disqualified. The Board appeals.

DISCUSSION

The Kansas State Fair Board, established by Kansas statutes, is the administrative agency that oversees the Kansas State Fair. See K.S.A. 2020 Supp. 74-520a; see also *Brown v. Board of State Fair Managers*, 6 Kan. App. 2d 40, 41, 626 P.2d 812 (1981) (holding the Board's predecessor was a Kansas agency subject to the Kansas Tort Claims Act). The Board consists of leaders of the Kansas agriculture and business communities—including the Secretary of Agriculture, the Secretary of Commerce, the Director for Extension of Kansas State University, and a representative nominated by the Kansas Fairs Association, among others. See K.S.A. 2020 Supp. 74-520a(a).

Kansas law empowers the Board to "adopt rules and regulations regarding the holding of the [S]tate [F]air and the control and government thereof." K.S.A. 74-523. This case turns primarily on the rules the Board adopted for the 2016 State Fair that prohibit the showing of animals that have been "unethically fitted"—essentially, using unethical practices to "fit" the animal for show. While the parties describe the rules' treatment of this prohibition in various ways, their dispute centers on *who* must make that determination:

- The Board asserts that unethical fitting is a legal determination to be made by the Board based on the evidence submitted at the administrative hearings.

6

- Gilliam contends that the Board's rules require a finding of unethical fitting to be made (and attested to) by a veterinarian.

The district court agreed with Gilliam, reversing the Board's disqualification decision because the fair's veterinarian had not specifically found that Lamb 11824 had been unethically fitted. The Board now challenges the district court's reversal, raising a plethora of jurisdictional and legal arguments.

Having reviewed the administrative record and the parties' numerous arguments, we agree with the Board and conclude that the rules empower the Board to make the ultimate determination as to whether a contestant has unethically fitted an animal at the competition. And we find that substantial competent evidence supports the Board's decision that Lamb 11824 had been unethically fitted during the 2016 State Fair. We thus reverse the district court's judgment and reinstate the Board's decision.

1. *The courts have jurisdiction to consider Gilliam's administrative appeal.*

Before turning to the Board's substantive arguments, we must first consider whether courts have the authority to consider Gilliam's administrative appeal at all, given the manner by which her appeal was initiated. The Board contends that Gilliam did not file her petition for judicial review within the time required by Kansas law, so the district court—and, by extension, this court—never acquired jurisdiction to hear her challenge to the Board's decision. We disagree and conclude the case is properly before us.

The Kansas Judicial Review Act provides the exclusive means of judicial review of most agency actions. K.S.A. 77-603; K.S.A. 77-606. As such, it governs our review here. Under the Act, a court may review an agency decision when a person files a petition challenging a final agency action within 30 days after service of a final order. K.S.A. 77-607(a); K.S.A. 77-610; K.S.A. 77-613(b). If a petition is not filed within this 30-day

7

period, a court does not have jurisdiction to consider the appeal. See *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, Syl. ¶ 6, 106 P.3d 492 (2005). A party has three extra days to file his or her petition—or 33 days total—if the final order is served by mail. See K.S.A. 77-613(e).

In most contexts, a final order is "self-defining," as it "definitely terminates a right or liability involved in an action or . . . grants or refuses a remedy as a terminal act in the case." *Kaelter v. Sokol*, 301 Kan. 247, 250, 340 P.3d 1210 (2015). In administrative actions, we have similarly explained that a final order "determines the legal rights and duties of the parties." *Guss v. Fort Hays State University*, 38 Kan. App. 2d 912, 916, 173 P.3d 1159 (2008). The parties agree that the Board's January 17, 2017, decision letter was a final order—or final agency action—under this definition, as it resolved the question of Gilliam's lamb's eligibility. The parties also agree that Gilliam did not file her petition for judicial review within 30 days after service of that letter.

Our jurisdictional analysis does not end with these facts, however. Kansas courts have long recognized that an agency's final order must comply with the provisions of K.S.A. 77-613(e) to trigger the 30-day appeal window for petitions for judicial review. *Heiland v. Dunnick*, 270 Kan. 663, 670-71, 19 P.3d 103 (2001). And K.S.A. 77-613(e) requires a final order in an administrative action to "state the agency officer to receive service of a petition for judicial review on behalf of the agency." This requirement preserves a person's appellate rights by informing him or her how to serve process for an administrative appeal. 270 Kan. at 671; *Reifschneider v. State*, 266 Kan. 338, 342-43, 969 P.2d 875 (1998). "The 30-day period for filing a petition for judicial review . . . *begins to run* '*after* service of the order'" that complies with K.S.A. 77-613(e). (Emphasis added.) 266 Kan. at 343.

Applying these principles to the case before us, the district court had jurisdiction to consider Gilliam's administrative appeal. Although the Board's January letter was a

final order, it did not trigger the appeal period because it failed to specify who should receive a petition for judicial review. The Board cured this omission by identifying an agent in its March letter. The record shows that the Board mailed its letter on March 17, so Gilliam had 33 days—until April 19—to file her petition. She did so on April 17. Thus, her appeal was timely, and the district court had jurisdiction to consider her claim.

2. *The district court erred when it reversed the Board's decision.*

Having confirmed that Kansas courts have jurisdiction to hear Gilliam's administrative appeal, we now turn to the substance of the Board's decision and the district court's ruling. As we have noted, the Board concluded—based on Dr. Grosdidier's report and the committee members' experience and inferences—that Lamb 11824 had been unethically fitted in violation of the 2016 State Fair rules. The Board therefore disqualified Gilliam's lamb and forfeited her award and monetary prize.

In her petition for judicial review, Gilliam raised several broad legal challenges to the Board's decision. She claimed the Board had exceeded its jurisdiction when it disqualified Lamb 11824's entry and revoked Gilliam's prize. She also claimed the Board misinterpreted or failed to follow its own rules and asserted that the Board's findings were not supported by substantial evidence in the record. The thrust of each of these arguments was that the fair rules required *the veterinarian* (or testing agency), as opposed to the Board, to make a determination of unethical fitting. Gilliam argued that because Dr. Grosdidier's report and affidavit never made this determination, the Board could not disqualify her.

The district court found this argument persuasive and reversed the Board's decision. The court observed that "Dr. Grosdidier's report arguably provided some evidence of the rule violation," but it concluded that the veterinarian's findings "do not rise to the level of substantial evidence." In reaching this decision, the court

9

acknowledged that the veterinarian "found evidence of injections that likely occurred within a week of his examination." But it noted that he "found no prohibited substances or irritants in the lamb" and "did not find the animal's appearance had been altered." And it emphasized that the veterinarian never used the phrase "unethical fitting" in his report or affidavit.

The Board challenges the district court's decision, claiming it misapplied the standard for reviewing administrative appeals and disregarded or downplayed the evidence that supported the Board's decision. We agree.

When someone appeals an agency's decision under the Kansas Judicial Review Act, the reviewing court—whether a district court, the Court of Appeals, or Supreme Court—may grant relief only if it determines that one or more of the situations in K.S.A. 77-621(c) applies. Because we exercise the same statutorily limited review, appellate courts give no deference to the district court's assessment of the agency action and instead treat the appeal as though it had been made directly to this court. See *In re Tax Appeal of Fleet*, 293 Kan. 768, 776, 272 P.3d 583 (2012); *Carlson Auction Service, Inc. v. Kansas Corporation Comm'n*, 55 Kan. App. 2d 345, 349, 413 P.3d 448 (2018).

Gilliam originally claimed that the Board's disqualification decision fell within four of the situations listed in K.S.A. 77-621(c), ranging from jurisdictional defects to interpretive errors to factual deficiencies. But each challenge was based on the same underlying allegation: that the Board misinterpreted and misapplied its rules regarding unethical fitting. According to Gilliam, the determination of unethical fitting rested with the veterinarian—not the Board—so the Board violated its rules when it made that finding. It exceeded the scope of its authority when it made the determination and disqualified her. And its decision lacked factual support, as everyone acknowledges that Dr. Grosdidier never explicitly found that Gilliam's lamb had been unethically fitted. See K.S.A. 77-621(c)(2), (4), (5), (7).

10

The district court limited its decision to Gilliam's last point, finding the Board's decision was not supported by substantial evidence in the record. On appeal, however, the Board addresses each of Gilliam's previous assertions. Gilliam, in turn, adds additional challenges—claiming that the Board's decision was arbitrary and capricious (essentially reiterating her previous arguments that the decision lacked a factual foundation) and asserting that later attempts by the Board to introduce new evidence to the district court during the administrative appeal violated her right to due process of law.

But though the parties present myriad arguments, they all turn on one question: *Who makes a determination of unethical fitting?* Answering this question requires a more thorough examination of the 2016 State Fair rules.

To begin, we observe that in most administrative appeals, courts examine rules that have been promulgated as administrative regulations. In those cases, the regulations have the force and effect of law, and we give no deference to the agency's (or district court's) interpretation. See K.S.A. 77-425; *Romkes v. University of Kansas*, 49 Kan. App. 2d 871, 880, 317 P.3d 124 (2014).

The 2016 State Fair rules are a different animal, as they are not regulations that have been published in the *Kansas Register* and do not appear to have been adopted through formal rulemaking. See K.S.A. 74-523 (authorizing the Board to "adopt rules and regulations" to govern the State Fair). Instead, these rules derive their authority in part through *agreement*. In other words, when Gilliam decided to compete in the 2016 State Fair, she agreed that she would comply with—and be bound by—the rules we now consider.

But regardless of the rules' origin, our standard of review remains unchanged. When considering statutes, regulations, or some other written document, appellate courts

11

do not defer to previous tribunals' interpretations. See *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018) (written contracts); *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013) (statutes). Instead, courts review and apply the governing language as written. And when language is conflicting or unclear, courts seek to ascertain and give effect to the drafters' intent. See *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963-64, 298 P.3d 250 (2013).

Admittedly, the 2016 State Fair rules are not a model of drafting clarity. They did not undergo the review process associated with statutes or formal regulations, but rather were written to govern the fair and its youth livestock competitions. We note that the rules contain numerous statements that could be confusing if taken out of context. The rules also contain some unfortunate (and likely inadvertent) language, such as a statement that Board management may "arbitrarily"—not *unilaterally*—determine all matters. But as in any case when we are called on to interpret the language of a written document, it is not the function of this court to read sections in isolation or highlight awkward phrasing. Accord *Trear*, 308 Kan. at 936 (written language should not be read in isolation but rather should be read in the context of the entire instrument). Instead, in the case of any ambiguity, we must endeavor to interpret the rules in a "'reasonable'" fashion that does not "'vitiate the purpose'" of the rules or reach an absurd result. 308 Kan. at 936.

With these principles in mind, we turn to the 2016 State Fair rules themselves. While some language in those rules is duplicative or even conflicting, there are at least two matters relevant to this case that are sufficiently unambiguous to inform our conclusion.

*First*, the rules unequivocally prohibit the "showing of unethically fitted livestock." Unethical fitting is defined as "changing the normal conformation of any part of an animal's body or using drugs, including over the counter and/or extra-label, or mechanical devices to alter the physical make-up and/or performance of the animal." The

rules provide several examples of unethical fitting, including (as the Board found applicable to this case):

- "Treating or massaging any part of the animal's body, internally or externally, with an irritant, counterirritant, or other substance to alter conformation";

- "Surgery or other practices performed to change the natural contour or appearance of an animal's body, hide, or hair";

- "Insertion of foreign material under the skin."

Gilliam attempts to construe these examples as an exclusive list of the circumstances that may constitute unethical fitting. But the plain language of the rules belies this assertion, noting that unethical fitting "includes but is not limited to" the examples provided. The rules state that "[a]ny exhibitor not complying with Kansas State Fair rules, regulations, and requirements"—including the prohibition on unethical fitting—"may be denied entry, participation[,] and facility usage."

*Second*, the rules reiterate in multiple sections that the Board is the fair's governing body and ultimate decision-maker. For example, the rules state that the Board "makes all rules and regulations and reserves the final and absolute right to interpret these rules and regulations." This includes the responsibility to "settle and determine all matters, questions and differences in regard there to, or otherwise arising out of, any connection with or incident pertaining to the Fair." When a situation arises that "no rule appears to cover," the fair's general manager will ask the Board "to make a rule and define its application to the situation." And when a participant of the fair wishes to protest or otherwise contest a fair official's preliminary finding of a rule violation—such as the determination that an animal has been unethically fitted—the protest is submitted to the Board for its consideration.

Gilliam attempts to sidestep these two clear directives by isolating one paragraph in the rules entitled "Consequences." That paragraph states:

> "In the event any animal is declared by the veterinarian or testing agency to be unethically fitted, the animal will immediately be disqualified and the exhibitor of that animal may be barred from participation in future Kansas State Fair competitions. The exhibitor will forfeit all titles, awards, premiums and prizes. The Kansas State Fair Board, through its management, makes all rules and regulations, and reserves the final and absolute right to interpret these rules and regulations."

Gilliam argues that the first sentence in this paragraph indicates that only a veterinarian or testing agency—not the Board—can find that an animal has been unethically fitted. We do not find this reading persuasive. The first sentence merely indicates that "in the event" a veterinarian has determined an animal was unethically fitted, immediate disqualification occurs. The language does not state that *only* a veterinarian can make that finding. Indeed, such a restriction would effectively shear off the rules' multiple statements that the Board holds ultimate decision-making authority, including its ability to review a contestant's protest. And it would defy common sense to rely on a veterinarian or testing agency to make a nonmedical or nonscientific assessment as to whether certain facts violated the rules.

Undoubtedly, this provision could have been phrased more artfully. But we do not find that it was intended to undermine the Board's authority—either under the 2016 fair rules and under Kansas law generally—to decide matters relating to the fair and its competitions. Instead, the language merely allocates different responsibilities to different entities. The veterinarian or testing agency is charged with making factual findings and conclusions based on testing or observation of the animal. But the final determinations— what constitutes unethical fitting and whether a specific factual finding meets that

14

definition—is for the Board to decide, consistent with its duty to interpret the rules and regulations.

Thus, the Board correctly interpreted the rules to vest it with ultimate decision-making authority. Contrary to Gilliam's assertions in her petition, the Board did not misinterpret or misapply the rules, nor did it exceed its jurisdiction by making a finding that Lamb 11824 had been unethically fitted. Gilliam has not demonstrated any error under K.S.A. 77-621(c)(2), (c)(4), or (c)(5).

And though the evidence before the Board was subject to multiple potential interpretations, the Board's decision regarding unethical fitting was supported by substantial evidence in light of the record as a whole. Dr. Grosdidier observed discoloration and swelling in the fat and muscle of both back legs, along with abnormal reddening of the skin over those areas, but a lab test did not reveal any drugs in the lamb's system. Given those facts, the veterinarian opined that the lamb had received injections up to a week, but more likely a few days, before slaughter, though he did not know what had been injected.

The Board drew various inferences from this information. Based on the negative lab results, the Board inferred that whatever had been injected was likely a naturally occurring substance. The multiple injections suggested their purpose was to alter the lamb's appearance. And though the Board could not conclude precisely when the injections occurred, it did not find Gilliam's jealous-competitor theory to be persuasive. In short, in light of the record as a whole, the Board's decision was supported by substantial evidence. Gilliam's challenges under K.S.A. 77-621(c)(7) and (c)(8) (which were based on the same factual arguments) are unavailing.

In its ruling, the district court acknowledged that there was "some" evidence of unethical fitting, but it did not find that evidence to be "substantial." In reaching this

conclusion, the district court incorrectly applied the standard for reviewing an administrative appeal. It is not the role of a reviewing court to reweigh the evidence or reevaluate the agency's credibility determinations. K.S.A. 77-621(d). Instead, the district court was charged with determining whether the Board's decision was supported by "evidence that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7). Substantial evidence—or substantial competent evidence—is merely evidence that possesses "'relevance and substance'" and furnishes "'a substantial basis in fact from which the issues can be reasonably resolved.'" *Harsay v. University of Kansas*, 308 Kan. 1371, 1382, 430 P.3d 30 (2018). This standard does not require—as the district court apparently believed—a reweighing of the administrative record to determine whether the evidence was, in the court's view, substantial *enough*. See *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, Syl. ¶ 2, 885 P.2d 1233 (1994) (an agency finding supported by substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion had it been the trier of fact).

Finally, we note that Gilliam's remaining procedural challenges are similarly unpersuasive. Gilliam presents two new arguments in her appeal to this court relating to the Board's actions—challenging Secretary McClaskey's ability to participate in the joint committee discussions and the Board's efforts to submit additional evidence to the district court regarding observations of Lamb 11824 during the fair. We ordinarily do not consider arguments raised for the first time on appeal because, among other reasons, we lack the benefit of a developed record for our review. See *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). And Gilliam has not shown that we should apply an exception to this preservation requirement.

The importance of presenting these arguments to the agency (or the district court) is particularly evident here. For example, because Gilliam did not raise her claim regarding Secretary McClaskey's participation to the Board, the Board never had the opportunity to consider whether Secretary McClaskey should have taken part in its

16

discussion. Nor are there facts in the record to support Gilliam's challenge. Gilliam and her father participated in the joint committee's hearing and had the opportunity to hear all the deliberations and present evidence regarding what they believed occurred. Similarly, with regard to Gilliam's other procedural claim, there is no indication in the record that the district court ever considered the additional evidence the Board submitted in its appeal; in fact, the court ultimately (though erroneously) ruled in Gilliam's favor.

In summary, the 2016 State Fair rules entrusted the Board with the power to resolve all matters relating to the fair. Under this authority, the Board determined—based on the evidence and inferences from Lamb 11824's veterinary examination—that Gilliam's lamb had been unethically fitted. The Board's action regarding Gilliam's lamb was consistent with the 2016 State Fair rules and supported by substantial evidence in the record. The district court thus erred when it reversed the Board's decision.

We reverse the district court's ruling reversing the Board's decision, and we affirm the Board's decision disqualifying Gilliam's lamb and canceling her award and monetary prize.