NOT DESIGNATED FOR PUBLICATION

No. 126,982

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JESSICA MOCK,
*Appellee*,

v.

PRESTIGE REALTY and ASSOCIATES, L.L.C.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; JOHN F. BOSCH, judge. Submitted without oral argument. Opinion filed October 11, 2024. Affirmed.

*Danielle N. Davey*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Lawrence, for appellant.

*Doug Thompson*, of Chapman, for appellee.

Before ISHERWOOD, P.J., WARNER and COBLE, JJ.

PER CURIAM: Prestige Realty and Associates, LLC (Prestige), appeals from the district court's order awarding Jessica Mock payment for real estate commissions on four properties, which had pending contracts but had not yet completed the final steps of the closing process, when Mock terminated her relationship with Prestige. Following a thorough review and analysis of the record, we are likewise persuaded that the contracts at issue were properly considered pending, as opposed to merely active, thus, Mock was entitled to receive a portion of the commissions borne of those contracts as contemplated

1

by the plain language of the parties' agreement. Accordingly, the decision of the district court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Mock, an independent real estate sales associate, entered into a business relationship with Prestige, a licensed and registered real estate brokerage firm, for which Dawn Schultz was the owner and primary broker. Their association was formalized, in part, once both parties signed the "Independent Contractor Agreement" drafted by Prestige. Under the terms of that agreement, Prestige retained Mock to "procure listings or buyer agency and other real estate related service contacts, solicit purchasers and/or lessees for various interests in and to real estate and conduct other real estate related services (collectively, the 'Services')." The agreement also outlined the terms governing compensation, and in affixing their signatures, the parties established the following conditions on that matter under paragraph 2:

> "The compensation of Contractor shall be based upon a proportionate share of the commission charged by Company for services rendered in real estate transactions in which Contractor may be involved. When Contractor shall perform any service pursuant to this Agreement, whereby a commission is earned, the commission shall, when collected, be divided between Company and Contractor pursuant to the schedule set out in Exhibit A, a copy of which is attached hereto and incorporated herein by this reference, and which Contractor acknowledges receipt."

The issue of commissions was afforded a finer point by virtue of three other aspects of the parties' agreement. First, it was clarified in some measure by the "Commission Calculation" the parties agreed to, which reflected that an "Agent," such as Mock, would receive 55% of commissions arising out of sales that are the product of company-generated leads. Additionally, paragraph 10 of their agreement addresses termination of the parties' relationship and contains language indicating that in the event

2

of dissolution by either party, "Company shall pay [Mock] any commissions due on pending contracts at time of closing, less any outstanding fees pursuant to Exhibit A." Finally, paragraph 3 of the agreed upon Commission Calculation further expands upon the considerations triggered by termination of the agreement. It provides: "Any active contracts, including but not limited to Exclusive Right to Sell Contracts or Buyers Agency Agreement, for the Company company-generated leads will be retained by the Company and [Mock] will not be paid any commission."

Mock terminated her relationship with Prestige via email in September 2020, at which time she had four contracts pending that were simply awaiting the final phase of closing. Specifically, all four buyers had completed the requisite inspections of their respective properties and paid the mandatory $595 brokerage fee that was due at closing. Three of the four buyers had entered into proposed resolutions with the sellers following their inspections, and the fourth was simply awaiting resolution paperwork. Once closing was finalized on those transactions, however, Prestige refused to deliver any commissions to Mock on the grounds that each contract was considered an "active . . . company-generated lead" at the time of Mock's departure. Thus, it was Prestige's position that under the terms of the parties' contract, Mock was not entitled to receive any compensation.

Mock filed suit against Prestige, alleging breach of contract. Following a bench trial, the district court awarded Mock commissions in the amount of $7,804.25. In support of its decision, the court highlighted the language in the parties' agreement, which stated that any commission due on pending contracts would be paid to the agent at the time of closing, less any outstanding fees. It noted that interpreting such language in favor of Mock was the only logical conclusion to be reached under the terms of the agreement.

3

Prestige brings the matter to our court for an analysis of whether the district court properly interpreted the terms agreed upon by the parties.

ANALYSIS

*Standard of Review*

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments. In so doing, we are not bound by the district court's interpretations or rulings. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018). "'The primary rule for interpreting written contracts is to ascertain the parties' intent.'" *Russell v. Treanor Investments*, 311 Kan. 675, 680, 466 P.3d 481 (2020). If the terms of the contract are clear, such intent shall be determined from the language of the contract without applying rules of construction. 311 Kan. at 680.

*Discussion*

Prestige argues the district court's decision should not be permitted to stand because it is the product of a flawed interpretation the court arrived at only by impermissibly isolating paragraph 10 of the agreement to distill the parties' intent. According to Prestige, had the district court afforded the parties' agreement the weight it deserved, particularly with respect to paragraph 3 in the Commission Calculation provisions, it would have been readily apparent that Mock was not entitled to commissions because each contract arose out of a company-generated lead and was active at the time the parties terminated their relationship. Mock counters with the same argument that yielded a successful ruling from the district court—that the contracts at issue were properly classified as pending when she parted ways with Prestige, and paragraph 10 of the parties' agreement, in conjunction with the other contractual provisions, entitles her to receive commissions for such contracts.

4

At the most fundamental level, the parties' dispute truly only arises out of two sections of their overall agreement—paragraph 10 in the Independent Contractor Agreement and paragraph 3 in the Commission Calculation. However, we are cognizant of our obligation to construe and consider the entire contract from its four corners, rather than isolate a particular sentence or provision, when tasked with the duty of discerning a contract's meaning. *Trear*, 308 Kan. at 936. Additionally, we are equally mindful that the law favors reasonable interpretations and that "'results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.'" 308 Kan. at 936. Following a thorough review of each provision the parties mutually agreed upon, we find the contracts were pending when Mock terminated her relationship with Prestige and she was entitled to receive commission for the role she played in securing the sales of those properties.

Turning to the parties' agreement, we note that at the outset, it outlines the services the parties contemplated Mock would render. It details how she would work exclusively on behalf of the company, and, in that capacity, she would "procure listings or buyer agency and other real estate related service contracts, solicit purchases and/or lessees . . . (collectively, the 'Services')." The agreement also clarified that Mock would "have autonomy over the details, manner and means by which the Services are provided under this Agreement."

Mock's compensation is addressed in the second paragraph, which explains that she will receive a "proportionate share of the commission charged by Company for services rendered in real estate transactions in which [she] may be involved." That provision goes on to explain that when Mock "perform[s] any service pursuant to this Agreement, whereby a commission is earned, the commission shall, when collected, be divided between Company and [Mock] pursuant to the schedule set out in Exhibit A." Finally, the paragraph states that "when the commission shall have been collected from

5

the party or parties for whom the services were performed, Company shall hold it in trust for [Mock] and Company to be divided according to the terms of this Agreement."

That brings us to paragraph 10 of the agreement, which addresses termination and allows either party to terminate the agreement at any time through a written notice. It states that upon such termination, "Company shall pay [Mock] *any* commissions due on *pending* contracts at time of closing, less any outstanding fees pursuant to Exhibit A." (Emphases added.)

Shifting to the parties' agreed upon Commission Calculation set out in Exhibit A and attached to their agreement, we find sections 1(b), 1(e), and 3 to be particularly informative in resolving the issue before us. Section 1(b) explains that "Commissions are not earned until the closing of a purchase agreement is complete and all paperwork is complete and approved by File Auditing." The specifics of the commission structure are then outlined under section 1(e), which clarifies that commissions will be paid to Mock after the $595 transaction fee is paid to the Company for each closed file. Finally, section 3, which Prestige relies on in support of its request for relief, addresses how some commissions will be handled when termination occurs. The provision explains that "[a]ny *active* contracts, including but not limited to Exclusive Right to Sell Contract or Buyers Agency Agreement, for the Company company-generated leads will be retained by the Company and [Mock] will not be paid any commission." (Emphasis added.)

During the bench trial, Schultz testified that the four contracts at issue were properly classified as company-generated leads and, despite being in a very advanced stage of the process when Mock opted to leave the firm, Schultz designated them as "active" contracts because a portion of the closing procedures were not yet completed. Thus, given those two characteristics, the plain language of the agreement did not allow for or require the allocation of any commissions to Mock from the four sales. Prestige holds firm to that position on appeal, and in an effort to establish a foundation for its

6

claim, Prestige essentially maintains that the firm's contracts fall into only one of two categories—active or closed. But such an interpretation is undermined by the plain language of the parties' agreement, which clearly contemplates a third category—pending contracts. Again, paragraph 10 states that the "Company *shall* pay [Mock] any commissions due on *pending* contracts at time of closing, less any outstanding fees pursuant to Exhibit A." (Emphases added.)

"Pending" is defined as "not decided or determined " or "being processed but not yet final." Webster's New World College Dictionary 1079 (5th ed. 2016). The use of that descriptor undermines any interpretation which views the contract through an all-or-nothing lens as Prestige would have us do. To adopt its conclusion that the terms of the agreement only contemplated active or closed contracts would require us to read paragraph 10 out entirely as no contract would ever be pending if it were not active. So, agents would never be entitled to receive commissions for such contracts. We cannot abide selective inclusion or excising of contractual language. Rather, to accurately ascertain the parties' intent, we must construe and consider the entire document. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

In conducting the required comprehensive analysis, we note that the term "pending" carries a significance which cannot be overlooked when considered in light of the nature of the agreement. Returning to that portion of the contract which outlined the responsibilities the parties contemplated Mock would perform as an agent with Prestige, it specifies that she will "procure listings or buyer agency and other real estate related service contracts, solicit purchasers and/or lessees for various interests in and to real estate and conduct other real estate related services (collectively the 'Services')." The term "procure" means "to get or bring about by some effort." Webster's New College Dictionary 1161 (5th ed. 2016). Additionally, the parties mutually agreed that Mock would be compensated when she "perform[ed] any service pursuant to" their agreed upon terms and would receive a "proportionate share of the commission . . . for services

7

rendered in real estate transactions" after the $595 transaction fee was submitted for each closed file. Thus, the distribution of commissions to Mock, once contracts pending at the time of her departure eventually close, necessarily embodies the parties' expressed desire to compensate her for performing "any service" within her contractual responsibilities which brought about "real estate related service contracts."

We also derive merit from the precise location in the contract where the term "pending" appears. To reiterate, it is included in the section addressing a potential dissolution of the parties' relationship but is not accompanied by the type of exclusionary or qualifying statements pertaining to company-generated leads that Schultz testified to. In our view, the language under the "Termination" header clarifies that an agent is not required to manage a contract through the completion of each closing procedure as a condition of obtaining any commission they earned during the life of that contract. That is, termination of an agent's relationship with Prestige does not necessarily dissolve their access to a commission they rightfully earned as a product of work they performed in accordance with the terms of their agreement.

The record before us reflects that Mock extensively shepherded the four contracts through a very lengthy process during which she showed the properties, secured buyers, and obtained signed contracts. Additionally, she took the initiative to schedule the required inspections for all four properties, personally attended three of those four inspections, secured the signed resolution paperwork that arose from those three inspections, and continued to monitor the resolution process for the fourth. At the time of Mock's departure from Prestige, all four contracts were merely "waiting for closing," having paid the required $595 transaction fee. The plain language of the parties' agreement reflects that Mock is entitled to compensation in the form of commissions for the commitment, effort, and skill she devoted to those sales. As a party who signed the written contract, Prestige is bound by its terms. See *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 52, 392 P.3d 68 (2017).

8

The district court heard the evidence and found that the four contracts were properly characterized as pending and within the scope of paragraph 10. That decision is consistent with the language of the parties' agreement and supported by substantial evidence in the record. Accordingly, the decision of the district court is affirmed.

Mock also asks this court to declare the contract ambiguous and suggests reformation of the agreement as a possible resolution. Given our decision on the first issue, it is not necessary that we analyze and rule upon Mock's request for reformation.

Affirmed.